**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 31, 2006

JOHANNA WOODARD, Individually and as
Next friend of AUSTIN D. WOODARD,
a Minor, and STEVEN WOODARD,

      Plaintiffs-Appellees
      and Cross-Appellants

v                                    No. 124994

JOSEPH R. CUSTER, M.D.,

      Defendant-Appellant
      and Cross-Appellee

and

MICHAEL K. LIPSCOMB, M.D.,
MICHELLE M. NYPAVER, M.D., and
MONA M. RISKALLA, M.D.,

      Defendants.
_____

JOHANNA WOODARD, Individually and as
Next Friend of AUSTIN D. WOODARD,
a Minor, and STEVEN WOODARD,

      Plaintiffs-Appellees
      and Cross-Appellants,

v                                    No. 124995

UNIVERSITY OF MICHIGAN MEDICAL
CENTER,

Defendant-Appellant
and Cross-Appellee.
_____

SHIRLEY HAMILTON, as Personal Representative
of the ESTATE OF ROSALIE ACKLEY,

 Plaintiff-Appellee,

and

BLUE CROSS BLUE SHIELD,

 Intervening Plaintiff,

v            No. 126275

MARK F. KULIGOWSKI, D.O.,

 Defendant-Appellant.
_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal in these two cases to consider whether plaintiffs' proposed expert witnesses are qualified under MCL 600.2169(1) to give expert testimony on the appropriate standards of medical practice or care. The trial courts in both cases ruled that plaintiffs' expert witnesses are not qualified under § 2169(1). In *Woodard,* the Court of Appeals affirmed the trial court's ruling on this issue, and, in *Hamilton,* the Court of Appeals reversed the trial court's decision. We conclude that the trial courts did not abuse their discretion in concluding that plaintiffs' proposed expert witnesses are not qualified under §

2

2169(1).  Therefore, in *Woodard,* we affirm the part of the Court of Appeals judgment that held that plaintiffs' proposed expert is not qualified and remand to the trial court for reentry of its order dismissing plaintiffs' claim with prejudice. In *Hamilton,* we reverse the Court of Appeals judgment and remand to the trial court for reentry of its order granting a directed verdict to defendant.[1]

## I.  FACTS AND PROCEDURAL HISTORY

### A.  *WOODARD V CUSTER*

We summarized the facts underlying this case in our recent decision in *Woodard v Custer,* 473 Mich 1, 3-5; 702 NW2d 522 (2005) (*Woodard I*):

> Plaintiffs' fifteen-day-old son was admitted to the Pediatric Intensive Care Unit (PICU) at the University of Michigan Hospital, where he was treated for a respiratory problem.  During his stay in the PICU, he was under the care of Dr. Joseph R. Custer, the Director of Pediatric Critical Care Medicine.  When the infant was moved to the general hospital ward, physicians in that ward discovered that both of the infant's legs were fractured.  Plaintiffs sued Dr. Custer and the hospital, alleging that the fractures were the result of negligent medical procedures, namely, the improper placement of an arterial line in the femoral vein of the infant's right leg and the improper placement of a venous catheter in the infant's left leg.

> Defendant physician is board-certified in pediatrics and has certificates of special qualifications in pediatric critical care medicine and neonatal-perinatal medicine.  Plaintiffs' proposed expert witness, who signed plaintiffs' affidavit of merit, is board-certified in pediatrics, but does not have any certificates of special qualifications.

---

[1] Contrary to Chief Justice Taylor's concurrence's assertion, *this* opinion is the *majority* opinion in this case given that it has four supporters-- Justices Cavanagh, Weaver, Kelly, and myself.  Chief Justice Taylor's concurrence sows confusion in an area of the law that is desperately in need of clarity.

3

Before discovery, the trial court denied defendants' motion for summary disposition, concluding that plaintiffs' attorney had a "reasonable belief" under MCL 600.2912d(1) that plaintiffs' proposed expert witness was qualified under MCL 600.2169 to testify against the defendant physician, and, thus, that plaintiffs' affidavit of merit was sufficient. After discovery, the trial court granted defendants' motion to strike plaintiffs' expert witness on the basis that he was not actually qualified under MCL 600.2169 to testify against the defendant physician. The trial court dismissed plaintiffs' claim with prejudice, concluding that plaintiffs could not reach a jury without expert testimony.

The Court of Appeals affirmed the trial court's ruling that plaintiffs' proposed expert witness was not qualified under MCL 600.2169 to testify against the defendant physician (Judge Borrello dissented on this issue), but reversed the trial court's dismissal on the basis that expert testimony was unnecessary under the doctrine of res ipsa loquitur, i.e., an inference of negligence may be drawn from the fact that the infant was admitted to the PICU with healthy legs and discharged from the PICU with fractured legs (Judge Talbot dissented on this issue). Unpublished opinion per curiam, issued October 21, 2003 (Docket Nos. 239868-239869). The case was remanded for trial.

Defendants sought leave to appeal the Court of Appeals decision that res ipsa loquitur applies and that expert testimony was not necessary. Plaintiffs sought leave to cross-appeal the Court of Appeals decision that their proposed expert witness was not qualified under MCL 600.2169 to testify against the defendant physician. We heard oral argument on whether to grant the applications or take other peremptory action permitted by MCR 7.302(G)(1). 471 Mich 890 (2004).

In *Woodard I,* we addressed defendants' application for leave to appeal and held that expert testimony is necessary in this case. At the same time, we granted plaintiffs' cross-application for leave to appeal to address whether plaintiffs'

4

proposed expert witness is qualified under MCL 600.2169(1), which is the subject of the instant opinion. 473 Mich 856 (2005).[2]

## B. *HAMILTON V KULIGOWSKI*

Plaintiff alleges that the defendant physician failed to properly diagnose and treat the decedent while she exhibited prestroke symptoms. The defendant physician is board certified in general internal medicine and specializes in general internal medicine. Plaintiff's proposed expert witness is board certified in general internal medicine and devotes a majority of his professional time to treating infectious diseases, a subspecialty of internal medicine. The trial court granted defendant's motion for a directed verdict on the basis that plaintiff's expert is not qualified to testify against the defendant physician because plaintiff's expert specializes in infectious diseases and did not devote a majority of his professional time to practicing or teaching general internal medicine. The Court of Appeals

---

[2] We directed the parties to address:

(1) what are the appropriate definitions of the terms "specialty" and "board certified" as used in MCL 600.2169(1)(a); (2) whether either "specialty" or "board certified" includes subspecialties or certificates of special qualifications; (3) whether MCL 600.2169(1)(b) requires an expert witness to practice or teach the same subspecialty as the defendant; (4) whether MCL 600.2169 requires an expert witness to match all specialties, subspecialties, and certificates of special qualifications that a defendant may possess, or whether the expert witness need only match those that are relevant to the alleged act of malpractice. See *Tate v Detroit Receiving Hosp*, 249 Mich App 212 (2002); and (5) what are the relevant specialties, subspecialties, and certificates of special qualifications in this case.

reversed, concluding that plaintiff's expert is qualified to testify against the defendant physician because both plaintiff's proposed expert witness and the defendant physician specialize in internal medicine and because plaintiff's proposed expert did devote a majority of his professional time to the practice of internal medicine given that the treatment of infectious diseases is a subspecialty of internal medicine. 261 Mich App 608; 684 NW2d 366 (2004). We granted defendant's application for leave to appeal. 473 Mich 858 (2005).[3]

## II. STANDARD OF REVIEW

These cases both involve the interpretation of MCL 600.2169(1). This Court reviews questions of statutory interpretation de novo. *Halloran v Bhan*, 470 Mich 572, 576; 683 NW2d 129 (2004). However, this Court reviews a trial court's rulings concerning the qualifications of proposed expert witnesses to testify for an abuse of discretion. *Cox v Flint Bd of Hosp Managers,* 467 Mich 1, 16 n 16; 651 NW2d 356 (2002). An abuse of discretion occurs when the decision results in an outcome falling outside the principled range of outcomes. *Novi v Robert Adell Children's Funded Trust,* 473 Mich 242, 254; 701 NW2d 144 (2005).

---

[3] We directed the parties to address:

> (1) the proper construction of the words "specialist" and "that specialty" in MCL 600.2169(1)(a) and MCL 600.2169(1)(b)(i); and (2) the proper construction of "active clinical practice" and "active clinical practice of that specialty" as those terms are used in MCL 600.2169(1)(b)(i).

### III. ANALYSIS

MCL 600.2169 provides, in pertinent part:

> (1) In an action alleging medical malpractice, a person shall not give expert testimony on the *appropriate* standard of practice or care unless *the person* is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in *the same specialty* as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in *that specialty*.
>
> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a *majority* of his or her professional time to either or both of the following:
>
> (i) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of *that specialty*.
>
> (ii) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in *the same specialty*. [Emphasis added.][4]

---

[4] MCL 600.2169(1) only applies to expert testimony on the appropriate standard of practice or care; it does not apply to other kinds of expert testimony, such as expert testimony on causation.

7

## A. MOST RELEVANT SPECIALTY AND BOARD CERTIFICATION

Although specialties and board certificates must match, not *all* specialties and board certificates must match. Rather, § 2169(1) states that "a person shall not give expert testimony on the *appropriate* standard of practice or care unless . . . ." (Emphasis added.) That is, § 2169(1) addresses the necessary qualifications of an expert witness to testify regarding the "*appropriate* standard of practice or care," not regarding an inappropriate or irrelevant standard of medical practice or care. Because an expert witness is not required to testify regarding an inappropriate or irrelevant standard of medical practice or care, § 2169(1) should not be understood to require such witness to specialize in specialties and possess board certificates that are not relevant to the standard of medical practice or care about which the witness is to testify. As this Court explained in *McDougall v Schanz*, 461 Mich 15, 24-25; 597 NW2d 148 (1999), "[MCL 600.2169(1)] operates to preclude certain witnesses from testifying solely on the basis of the witness' lack of practice or teaching experience in the *relevant* specialty." (Emphasis added.)

Further, § 2169(1) refers to "the same specialty" and "that specialty." It does not refer to "the same specialties" and "those specialties." That is, § 2169(1) requires the matching of a singular specialty, not multiple specialties. As the Court of Appeals explained in *Tate v Detroit Receiving Hosp,* 249 Mich App 212, 218; 642 NW2d 346 (2002), "the statute expressly uses the word 'specialty,' as opposed to 'specialties,' thereby implying that the specialty requirement is tied to

8

the occurrence of the alleged malpractice and not unrelated specialties that a defendant physician may hold."

Moreover, § 2169(1)(b) requires the plaintiff's expert to have "during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a *majority* of his or her professional time to either" the "active clinical practice" or the "instruction of students" in "the same specialty" as the defendant physician.[5]  (Emphasis added.)  Obviously, a specialist can only devote a *majority* of his professional time to *one* specialty.  Therefore, it is clear that § 2169(1) only requires the plaintiff's expert to match one of the defendant physician's specialties.  Because the plaintiff's expert will be providing expert testimony on the appropriate or relevant standard of practice or care, not an inappropriate or irrelevant standard of practice or care, it follows that the plaintiff's expert witness must match the one most relevant standard of practice or care--the specialty engaged in by the defendant physician during the course of the alleged malpractice, and, if the defendant physician is board certified in that specialty, the plaintiff's expert must also be board certified in that specialty.

---

[5] Because the two cases at issue here involve questions pertaining to plaintiffs' expert witnesses' qualifications, we repeatedly refer to § 2169(1) as imposing requirements on plaintiffs' experts.  However, contrary to Chief Justice Taylor's concurrence's contention, *post* at 43, we recognize that § 2169(1) applies equally to a defendant's expert witnesses because it applies both to expert testimony offered "against" and on "behalf" of the defendant physician.  We also note that although we repeatedly refer to the defendant physician, we recognize that § 2169(1) applies to all licensed health professionals, not just physicians.

B. SAME SPECIALTY REQUIREMENT

The first requirement of § 2169(1)(a) is that "[i]f the party against whom or on whose behalf the testimony is offered is a specialist, [the expert witness must have] specialize[d] at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered." That is, if a defendant physician is a specialist, the plaintiff's expert witness must have specialized in the same specialty as the defendant physician at the time of the alleged malpractice.

MCL 600.2169(1) does not define the term "specialty." "We may consult dictionary definitions of terms that are not defined in a statute." *People v Perkins,* 473 Mich 626, 639; 703 NW2d 448 (2005). "[T]echnical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." MCL 8.3a. Because § 2169(1) pertains to "actions[s] alleging *medical* malpractice" and because the term "specialty" may have acquired a "peculiar and appropriate meaning" in the medical field, it is appropriate to look to medical dictionaries to define the term "specialty." (Emphasis added.)

*Dorland's Illustrated Medical Dictionary* (28th ed) defines a "specialist" as "a physician whose practice is limited to a particular branch of medicine or surgery, especially one who, by virtue of advanced training, is certified by a specialty board as being qualified to so limit his practice." MCL 600.2169(1)(a) requires the plaintiff's expert to specialize in the same specialty as the defendant

10

physician, and, if the defendant physician is "a *specialist who is board certified*, the expert witness must be a specialist who is board certified in that specialty." (Emphasis added.) Both the dictionary definition of "specialist" and the plain language of § 2169(1)(a) make it clear that a physician can be a specialist who is not board certified. They also make it clear that a "specialist" is somebody who can potentially become board certified. Therefore, a "specialty" is a particular branch of medicine or surgery in which one can potentially become board certified. Accordingly, if the defendant physician practices a particular branch of medicine or surgery in which one can potentially become board certified, the plaintiff's expert must practice or teach the same particular branch of medicine or surgery.

Plaintiffs argue that § 2169(1)(a) only requires their expert witnesses to have specialized in the same specialty as the defendant physician, not the same subspecialty. We respectfully disagree. As explained above, "specialty" is defined as a particular branch of medicine or surgery in which one can potentially become board certified. Moreover, "sub" is defined as "a prefix . . . with the meanings 'under,' 'below,' 'beneath' . . . 'secondary,' 'at a lower point in a hierarchy[.]'" *Random House Webster's College Dictionary* (1997). Therefore, a "subspecialty" is a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty. A subspecialty, although a more particularized specialty, is nevertheless a specialty. Therefore, if a defendant physician

11

specializes in a subspecialty, the plaintiff's expert witness must have specialized in the same subspecialty as the defendant physician at the time of the occurrence that is the basis for the action.[6]

### C. SAME BOARD CERTIFICATE REQUIREMENT

The next requirement of § 2169(1)(a) is that "if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty." As we recently explained in *Halloran, supra* at 574, "MCL 600.2169(1)(a) requires that the proposed expert witness must have the same board certification as the party against whom or on whose behalf the testimony is offered."

Plaintiffs argue that the definition of "board certified" found in the Public Health Code should apply here. We respectfully disagree. The Public Health Code, MCL 333.2701(a), defines "board certified" as "certified to practice in a particular medical specialty by a national board recognized by the American board of medical specialties or the American osteopathic association." However, the Legislature specifically limited the use of the Public Health Code's definition of "board certified" to the Public Health Code by stating, "*As used in this part . . .* '[b]oard certified' means . . . ." MCL 333.2701(a) (emphasis added). The statute at issue here, MCL 600.2169(1), is part of the Revised Judicature Act, not the

_____

[6] We note that the American Board of Medical Specialties, the national certifying board by which 90 percent of all physicians are certified, states in its amicus curiae brief that a subspecialty constitutes a specialty.

Public Health Code, and, thus, the Public Health Code's definition of "board certified" does not apply to the statute at issue here.[7]

Moreover, the Legislature has defined "board certified" differently in other statutes. Therefore, even if we thought it appropriate to borrow another statute's definition of "board certified," the definition would vary depending on which statute's definition was borrowed. For instance, the Legislature has defined "board certified" in the Insurance Code, MCL 500.2212a(4), as "certified to practice in a particular medical or other health professional specialty by the American board of medical specialties or another appropriate national health professional organization." Plaintiffs fail to explain why we should choose the Public Health Code's definition over the Insurance Code's definition. We also note that the Legislature limited the Insurance Code's definition of "board certified" to the Insurance Code by stating, "*As used in this section*, 'board certified' means . . . ." *Id.* (emphasis added). Because the statute at issue here is part of the Revised Judicature Act, not the Insurance Code, the Insurance Code's definition does not apply to the statute at issue here. Since the Legislature has not defined "board certified" in the statute at issue here, we instead look to the medical dictionary definition of "board certified." *Perkins, supra* at 639.

---

[7] Further, as this Court explained in *Farrington v Total Petroleum, Inc,* 442 Mich 201, 210; 501 NW2d 76 (1993), "[c]ourts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there."

*Taber's Cyclopedic Medical Dictionary* (18th ed) defines "certification" as "a legal document prepared by an official body that indicates a person or institution has met certain standards, or that a person has completed a prescribed course of instruction or training." Similarly, *Gould Medical Dictionary* (3d ed) defines "certification" as "[a] statement by an officially recognized and legally constituted body, such as a medical board, that a person or institution has met or complied with certain standards of excellence." Therefore, we conclude that to be "board certified" within the meaning of § 2169(1)(a) means to have received certification from an official group of persons who direct or supervise the practice of medicine that provides evidence of one's medical qualifications.[8] Accordingly, if a defendant physician has received certification from a medical organization to this effect, the plaintiff's expert witness must also have obtained the same certification in order to be qualified to testify concerning the appropriate standard of medical practice or care.

Plaintiffs argue that a certificate of special qualifications[9] is not a board certificate. We respectfully disagree. Contrary to plaintiffs' assertion, nothing in § 2169(1)(a) limits the meaning of board certificate to certificates in the 24 primary medical specialties recognized by the American Board of Medical

---

[8] We find it befuddling that Chief Justice Taylor's concurrence would adopt the definition of "board certified" set forth by the Appellate Division of the Supreme Court of New York without further explanation.

[9] We note that these certificates are also sometimes referred to as "certificates of added qualification."

Specialties or the 18 primary medical specialties recognized by the American Osteopathic Association. Because a certificate of special qualifications is a document from an official organization that directs or supervises the practice of medicine that provides evidence of one's medical qualifications, it constitutes a board certificate. Accordingly, if a defendant physician has received a certificate of special qualifications, the plaintiff's expert witness must have obtained the same certificate of special qualifications in order to be qualified to testify under § 2169(1)(a).[10]

## D. SAME PRACTICE/INSTRUCTION REQUIREMENT

MCL 600.2169(1)(b) provides that if the defendant physician is a specialist, the expert witness must have "during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either . . . the active clinical practice of that specialty [or] [t]he instruction of students in an . . . accredited health professional school or accredited residency or clinical research program in the same specialty."[11] Once

---

[10] We note that the American Board of Medical Specialties stated in its amicus curiae brief that it considers certificates of special qualifications to constitute board certificates.

[11] If the defendant physician is not a specialist, § 2169(1)(b) requires the plaintiff's expert witness to have "during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either . . . [t]he active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed [or] [t]he instruction of students in an accredited health professional school or accredited residency or clinical research program in

(continued…)

again the statute refers to "the same specialty" and "that specialty," implying that only a single specialty must be matched. In addition, § 2169(1)(b) requires the plaintiff's expert to have "devoted a majority of his or her professional time" to practicing or teaching the specialty in which the defendant physician specializes. As we explained above, one cannot devote a "majority" of one's professional time to more than one specialty. Therefore, in order to be qualified to testify under § 2169(1)(b), the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty.[12]

### E. RESPONSE TO CHIEF JUSTICE TAYLOR'S CONCURRENCE

Chief Justice Taylor's concurrence concludes that unless the defendant physician *himself* concedes that not all of his specialties are relevant, the plaintiff's expert must match all of the defendant physician's specialties. However, because the concurrence recognizes that it would be impossible to obtain an expert witness

---

(…continued)
the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed . . . ."

[12] Just as a subspecialty is a specialty within the meaning of § 2169(1)(a), a subspecialty is a specialty within the meaning of § 2169(1)(b). Therefore, if the defendant physician specializes in a subspecialty and was doing so at the time of the alleged malpractice, the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching that subspecialty.

16

who devotes a majority of his professional time to all of the defendant physician's specialties, see § 2169(1)(b) and part III(D) of this opinion, the concurrence concludes that the plaintiff can simply employ multiple experts to satisfy the requirements of § 2169(1). That is, a single expert does not have to satisfy all of the requirements of § 2169(1), as long as a group of experts collectively satisfy these requirements. We respectfully disagree.

MCL 600.2169(1) states, "*a person* shall not give expert testimony on the appropriate standard of practice or care unless *the person* is licensed as a health professional in this state or another state and meets the following criteria . . . ." (Emphasis added.) That is, § 2169(1) states that a person cannot testify unless that person meets all of the requirements of § 2169(1). If that person does not meet all of the requirements of § 2169(1), that person cannot testify.[13] For the reasons discussed above, we conclude that the plaintiff's expert does not have to match all of the defendant physician's specialties; rather, the plaintiff's expert only has to match the one most relevant specialty.

[13] Contrary to Chief Justice Taylor's concurrence's contention, we do not hold that "only one expert may be utilized." *Post* at 4. Rather, we make a distinction between experts testifying about the standard of practice or care and experts testifying about issues that are not related to the standard of practice or care. Regarding the former, we conclude that only one standard of practice or care was envisioned under § 2169(1), and, thus, the plaintiff need only produce one expert to testify about that standard. If a plaintiff wishes to, however, he is free to offer several different experts to testify regarding that relevant specialty, and each must meet the criteria of § 2169(1). With respect to experts who are testifying about issues unrelated to the standard of practice or care, there are no limitations on how many experts a plaintiff can produce, and a trial court will consider whether each expert is qualified using the considerations set forth in § 2169(2) as well as any other applicable requirements.

Not only is the approach of Chief Justice Taylor's concurrence contrary to the requirements of the statute, it is also an approach that we believe would be unworkable in the real world. Under the concurrence's approach, if the defendant physician specializes in five specialties, for example, and refuses to concede that not all of these specialties are relevant to the alleged malpractice, the plaintiff would be required to present five expert witnesses to testify. Not only would this be extraordinarily burdensome for the plaintiff, it would also be extraordinarily burdensome for the trier of fact by infecting the entirety of the trial process with irrelevant, distracting, and confusing arguments.[14]

The concurrence by Chief Justice Taylor accuses the majority of "misunderstand[ing] completely the traditional roles played by the judge and jury in the trial process." *Post* at 33. However, we believe that it is the concurrence that misunderstands these roles. Typically, the trial court allows the parties to

_____

[14] The concurrence by Chief Justice Taylor seems to believe that this would not be a problem because MCL 600.2955 precludes opinion testimony that is not based on "proven theories and methodologies." *Post* at 35 n 58. By this argument, the concurrence seems to be confusing relevancy and reliability. Just because an expert testifies that the standard of care with regard to nephrology is "X," and this testimony is reliable in the sense that it is based on "proven theories and methodologies," does not mean that it is relevant testimony. Evidence is only relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. If the defendant physician was not practicing nephrology at the time of the alleged malpractice, testimony regarding the standard of care for nephrology will not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." If the standard of care for nephrology is irrelevant, why require an expert witness to specialize in nephrology?

18

introduce relevant evidence and does not allow the parties to introduce irrelevant evidence. See MRE 402, which provides, "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court. Evidence which is not relevant is not admissible." Under the concurrence's approach, however, the parties would effectively be required to present irrelevant evidence, potentially a great amount of such evidence. And, instead of the trial court itself reviewing the evidence to determine what is and what is not relevant, the trier of fact would be required to do so.[15]

---

[15] The concurrence by Chief Justice Taylor asks us, "How is the trial judge to determine which specialties are 'relevant' without expert testimony . . . ?" *Post* at 40. First, in most cases, expert testimony probably will not be required to determine which specialties are relevant. For instance, if a defendant physician specializes in cardiovascular surgery and podiatry and he was performing heart surgery at the time of the alleged malpractice, we doubt very highly that the trial court will need expert testimony to determine that cardiovascular surgery is the relevant specialty. The concurrence states that it finds our belief that the trial court may be able to determine without expert testimony which specialty is relevant "curious given this Court's historical recognition that expert testimony is almost always needed to establish the standard of care in medical malpractice actions." *Post* at 40 n 64. The concurrence appears to be ignoring the distinction between determining which specialty is relevant and determining the appropriate standard of care. Using the cardiovascular surgeon/podiatrist example, although the trial court can probably determine without expert testimony that cardiovascular surgery is the relevant specialty, the trial court probably cannot determine what the appropriate standard of care is for cardiovascular surgeons performing heart surgery.

Second, the trial court is, of course, not precluded from seeking expert testimony if it believes that such testimony is necessary for it to determine which specialty is relevant.

19

Requiring the admission of irrelevant evidence would not only be a waste of time and limited judicial resources, it would also cause enormous confusion and distraction for the fact-finder. For instance, if the defendant physician claims to specialize in dermatology, internal medicine, plastic surgery, pediatrics, and urology and he negligently prescribes an adult dosage of amoxicillin to a three-year-old child suffering from an ear infection, under the majority's approach, the plaintiff's expert would have to specialize in pediatrics. However, under the approach of Chief Justice Taylor's concurrence, the plaintiff's phalanx of experts would have to specialize in dermatology, internal medicine, plastic surgery, pediatrics, and urology. That is, instead of the jury hearing testimony regarding the relevant specialty of pediatrics, the jury would be required also to endure testimony regarding the irrelevant specialties of dermatology, internal medicine, plastic surgery, and urology. To require the jury to hear such irrelevant testimony would confuse the jury and distract it from evaluating the relevant legal issues. Because this is not how the trial process is typically conducted in Michigan, and because the statute does not require trials to be conducted in such a confusing manner, we refuse to impose such a requirement upon the process.

The concurrence by Chief Justice Taylor contends that we are giving the trial court "a power of theory preclusion . . . heretofore unknown in our jurisprudence." *Post* at 33. First, whether expert testimony is described as a "theory" or evidence supporting a theory, testimony regarding a specialty that was not being practiced at the time of the alleged malpractice is irrelevant, and, thus,

20

inadmissible.  In other words, irrelevant expert testimony does not magically become relevant and admissible simply by calling it a "theory."  To use the concurrence's collapsed building hypothetical, the defendant architect would obviously be able to introduce relevant evidence of an earthquake.  However, he would not be able to introduce irrelevant evidence of an earthquake, for instance, evidence that an earthquake occurred years after the building collapsed in a country half way around the world.  That is, the defendant architect is not precluded from introducing relevant theories, i.e., that the building collapsed because an earthquake occurred that same day in a neighboring city, but he is precluded from introducing irrelevant theories, i.e., that the building collapsed because an earthquake occurred years after the building collapsed in a country half way around the world.

Second, our holding that relevant expert testimony is admissible and irrelevant expert testimony is inadmissible is hardly a novel holding.  As we have explained, it has always been the trial court's job to facilitate the introduction of relevant evidence and to preclude the introduction of irrelevant evidence.[16]  We

---

[16] The concurrence by Chief Justice Taylor contends that our opinion will deny parties their constitutional right to have a jury determine factual matters. *Post* at 33.  This is simply incorrect.  Whether expert testimony is relevant and whether an expert is qualified to testify have historically been decisions for the trial court, not a jury, to make.  *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780 n 46; 685 NW2d 391 (2004).  Relevancy is not, and has never been, a factual determination that is left to the jury to make.  MRE 402 and 702.

The concurrence also contends that our opinion will deny parties their procedural due process rights because it will deny them the right to present

(continued…)

are aware of no precedent that would require all irrelevant specialties to match, or that would countenance a phalanx of experts, each of whom would be charged with testifying about a different irrelevant specialty. As the concurrence by Chief Justice Taylor itself recognizes, it is they, not the majority, that are advocating a change in the status, because the Court of Appeals in *Tate* held that irrelevant specialties do not have to match. The horror stories predicted by the concurrence upon the adoption of the majority position simply have not been borne out under *Tate*. Moreover, we note that *none* of the parties in these two cases argued that irrelevant specialties and board certificates must match, and none of the parties or the amici curiae argued in favor of the approach adopted by Chief Justice Taylor's concurrence.

Further, we note that just because an expert is qualified under § 2169(1) does not mean that the trial court cannot disqualify the expert on other grounds. MCL 600.2169(2) provides:

> In determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, evaluate all of the following:
>
> (a) The educational and professional training of the expert witness.

---

(…continued)

evidence. *Post* at 42-43. Although parties have a right to present relevant evidence, as long as the admission of such evidence does not violate the Constitution of the United States, the Constitution of the state of Michigan, a rule of evidence, or a court rule, parties do not have a right to present irrelevant evidence. MRE 402. Further, parties are not precluded from arguing that a certain specialty is relevant. However, it is up to the trial court in its gatekeeping role to determine whether the specialty is actually relevant. *Gilbert*, *supra* at 780 n 46.

(b) The area of specialization of the expert witness.

(c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.

(d) The relevancy of the expert witness's testimony.

In addition, MCL 600.2169(3) specifically states, "[t]his section does not limit the power of the trial court to disqualify an expert witness on grounds other than the qualifications set forth in this section." MCL 600.2955 provides:

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

23

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

(3) In an action alleging medical malpractice, the provisions of this section are in addition to, and do not otherwise affect, the criteria for expert testimony provided in section 2169.

Finally, MRE 702 further provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Therefore, even when a proffered expert meets the criteria contained in § 2169(1), the expert is subject to further scrutiny under § 2169(2), § 2169(3), § 2955, and MRE 702.[17]

Moreover, if a defendant believes that the plaintiff's expert is not qualified because he does not specialize in what the defendant believes to be the relevant specialty, the defendant can file a motion to strike the plaintiff's expert. If the trial court denies that motion, the defendant can then, of course, appeal that decision.

---

[17] We note that, while § 2169(1) only applies to "expert testimony on the appropriate standard of practice or care," § 2169(2), § 2955, and MRE 702 apply to all expert testimony in medical malpractice actions. Therefore, while all experts must meet the requirements of § 2169(2), § 2955, and MRE 702, only those experts testifying regarding the appropriate standard of practice or care have to meet the requirements of § 2169(1).

The defendant can either file an interlocutory appeal or he can wait until the jury renders a verdict to file an application for leave to appeal. Either way, the defendant can certainly preserve the issue for appeal by objecting to the plaintiff's expert's testimony on the basis that the expert is not qualified because he does not specialize in the relevant specialty. At this point, the defendant should make clear what he thinks the relevant specialty is and why he thinks such is the relevant specialty.[18]

IV. APPLICATION

A. *WOODARD V CUSTER*

The defendant physician is the director of pediatric critical care medicine at the University of Michigan Hospital, and specializes in pediatric critical care medicine. "Pediatrics" is "[t]he medical specialty concerned with the study and treatment of children in health and disease during development from birth through adolescence." *Stedman's Medical Dictionary* (26th ed). "Critical" is defined as "[d]enoting a morbid condition in which death is possible." *Id.* Pediatric critical care medicine is the branch of medicine concerned with the care of children who are critically ill. Plaintiffs claim that an arterial line was improperly placed in the

---

[18] The concurrence by Chief Justice Taylor apparently believes that this will require the creation of a separate record and that each party will have to present its own experts at this point. We respectfully disagree. All a defendant has to do to preserve the issue for appeal is to object to the admission of the plaintiff's expert's testimony and to state why he believes the plaintiff's expert is not qualified. If the issue is appealed and the appellate court believes that it does not have enough information before it to review the trial court's decision, it can certainly remand for an evidentiary hearing or take other appropriate action. The concurrence creates the potential for procedural confusion out of thin air.

femoral vein of the infant patient's right leg and that a venous catheter was improperly placed in the infant patient's left leg while the infant was a patient in the defendant hospital's pediatric intensive care unit. There is no question that the infant patient was critically ill when these procedures were performed. For these reasons, we conclude that the trial court did not abuse its discretion in finding that the defendant physician was practicing pediatric critical care medicine at the time of the alleged malpractice, and, thus, pediatric critical care medicine is the one most relevant specialty.[19] Plaintiffs' proposed expert witness undeniably did not specialize in pediatric critical care medicine at the time of the alleged malpractice and has never specialized in pediatric critical care medicine. Therefore, plaintiffs'

---

[19] Chief Justice Taylor's concurrence asks us how we "know" that the defendant physician was practicing pediatric critical care medicine at the time of the alleged malpractice. *Post* at 39. We "know" this because all of the admissible evidence supports the trial court's finding that the defendant physician was practicing pediatric critical care medicine at the time of the alleged malpractice. Further, as Chief Justice Taylor's concurrence points out, *post* at 38, 48-49, the plaintiffs did not rebut that finding by presenting qualified expert testimony to support their argument that the defendant physician was not practicing pediatric critical care medicine at the time of the alleged malpractice. Contrary to what Chief Justice Taylor's concurrence suggests, even assuming that plaintiffs' expert is qualified to testify that defendant was not practicing pediatric critical care medicine at the time of the alleged malpractice, plaintiffs' expert cannot reasonably be understood to have testified that the defendant was not practicing pediatric critical care medicine at the time of the alleged malpractice. Plaintiffs' expert only testified that *he* performed the procedures in this case during his residency. Unlike Chief Justice Taylor's concurrence, we do not believe that the jury could have reasonably inferred from this testimony that it is "relatively common for doctors who practice only general pediatric care to perform the procedures in this case . . . ." *Post* at 39 n 63. Moreover, it is not our task to "know" whether pediatric critical care medicine is or is not the relevant specialty; rather, our task is to determine whether the trial court abused its discretion in determining that pediatric critical care medicine is the relevant specialty.

proposed expert witness does not satisfy the same specialty requirement of § 2169(1)(a).[20]

The defendant physician is board certified in pediatric critical care medicine, and, as explained above, pediatric critical care medicine is the one most relevant specialty. Plaintiffs' proposed expert witness is not board certified in pediatric critical care medicine. Therefore, plaintiffs' proposed expert witness does not satisfy the same board certificate requirement of § 2169(1)(a).

As explained above, the defendant physician specializes in pediatric critical care medicine and pediatric critical care medicine is the one most relevant specialty. During the year immediately preceding the alleged malpractice, plaintiffs' proposed expert witness did not practice or teach pediatric critical care medicine.[21] Therefore, plaintiffs' proposed expert witness also does not satisfy the same practice/instruction requirement of § 2169(1)(b).

----

[20] Plaintiffs' proposed expert witness is a pediatrician, not a pediatric critical care specialist. A good illustration of the differences between these two types of physicians can be found in this very case: when the infant began to have respiratory problems, plaintiffs took their son to the pediatrician; the pediatrician, recognizing that the infant needed to be treated by a pediatric critical care specialist, then placed the infant in an ambulance and sent him to the defendant hospital, for treatment by the defendant physician.

[21] In fact, plaintiffs' proposed expert witness has never worked as an attending physician in a pediatric intensive care unit nor has he ever taught pediatric critical care medicine. Further, plaintiffs' proposed expert has not inserted an arterial line or a venous catheter in an infant, the specific medical procedure that was allegedly performed negligently in this case, since his residency in the early 1980's.

For these reasons, the trial court did not abuse its discretion in concluding that plaintiffs' proposed expert witness is not qualified to testify on the appropriate standard of practice or care under § 2169(1). Because plaintiffs failed to present an expert qualified under § 2169(1) to testify with regard to the appropriate standard of practice or care, the trial court properly dismissed plaintiffs' claim with prejudice.

## B. *HAMILTON V KULIGOWSKI*

The defendant physician specializes in general internal medicine and was practicing general internal medicine at the time of the alleged malpractice. During the year immediately preceding the alleged malpractice, plaintiffs' proposed expert witness did not devote a majority of his time to practicing or teaching general internal medicine. Instead, he devoted a majority of his professional time to treating infectious diseases. As he himself acknowledged, he is "not sure what the average internist sees day in and day out." Therefore, plaintiff's proposed expert witness does not satisfy the same practice/instruction requirement of § 2169(1)(b).

For this reason, the trial court did not abuse its discretion in concluding that plaintiff's proposed expert witness is not qualified to testify regarding the appropriate standard of practice or care under § 2169(1). Because plaintiff failed to present an expert qualified under § 2169(1) to testify with regard to the appropriate standard of practice or care, the trial court properly granted a directed verdict in favor of defendant.

28

V. CONCLUSION

If a defendant physician is a specialist, the plaintiff's expert witness must have specialized in the same specialty as the defendant physician at the time of the occurrence that is the basis for the action. If a defendant physician specializes in a subspecialty, the plaintiff's expert witness must have specialized in the same subspecialty as the defendant physician at the time of the occurrence that is the basis for the action. If the defendant physician is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty. If the defendant physician has received a certificate of special qualifications, the plaintiff's expert witness must have obtained the same certificate of special qualifications. However, under § 2169(1)(a), only the one most relevant specialty or subspecialty must match; and only the one most relevant board certificate or certificate of special qualifications must match. We are aware of no precedent that would, as required by Chief Justice Taylor's concurrence, require all irrelevant specialties to match or countenance a phalanx of experts, each of whom would be charged with testifying about a different irrelevant specialty. In addition, under § 2169(1)(b), if the defendant physician is a specialist, the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty or subspecialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty or subspecialty.

The trial courts did not abuse their discretion here in concluding that plaintiffs' proposed expert witnesses were not qualified under MCL 600.2169(1) to testify regarding the appropriate medical standard of practice or care. Therefore, in *Woodard,* we affirm the part of the Court of Appeals judgment that held that plaintiffs' proposed expert is not qualified and remand this case to the trial court for reentry of its order dismissing plaintiffs' claim with prejudice. In *Hamilton,* we reverse the Court of Appeals judgment and remand this case to the trial court for reentry of its order granting a directed verdict to defendant.

Stephen J. Markman
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly

STATE OF MICHIGAN

SUPREME COURT


JOHANNA WOODARD, Individually and as
Next friend of AUSTIN D. WOODARD,
a Minor, and STEVEN WOODARD,

      Plaintiffs-Appellees
      and Cross-Appellants

v                                  No. 124994

JOSEPH R. CUSTER, M.D.,

      Defendant-Appellant
      and Cross-Appellee

and

MICHAEL K. LIPSCOMB, M.D.,
MICHELLE M. NYPAVER, M.D., and
MONA M. RISKALLA, M.D.,

      Defendants.
_____

JOHANNA WOODARD, Individually and as
Next Friend of AUSTIN D. WOODARD,
a Minor, and STEVEN WOODARD,

      Plaintiffs-Appellees
      and Cross-Appellants,

v                                  No. 124995

UNIVERSITY OF MICHIGAN MEDICAL
CENTER,

      Defendant-Appellant
      and Cross-Appellee.

_____

SHIRLEY HAMILTON, as Personal Representative
of the ESTATE OF ROSALIE ACKLEY,

    Plaintiff-Appellee,

and

BLUE CROSS BLUE SHIELD,

    Intervening Plaintiff,

v                                       No. 126275

MARK F. KULIGOWSKI, D.O.,

    Defendant-Appellant.
_____


CAVANAGH, J. (*concurring*).

I continue to believe that MCL 600.2169 is unconstitutional for the reasons set forth in my dissent in *McDougall v Schanz*, 461 Mich 15, 38; 597 NW2d 148 (1999) (Cavanagh, J., dissenting). But because a majority of my colleagues disagree, the statute remains in place. Accordingly, the bench and bar are entitled to be guided in its application. It is for that reason that I join the majority opinion's statutory analysis outlined by Justice Markman.

Nonetheless, I take this opportunity to point out that the difficulties in interpreting and applying § 2169 are highlighted both by the frequency with which a variety of issues surrounding the statute arise and the inability of this Court to reach a consensus on how the statute is to operate. In my view, this serves to

2

validate the many concerns I held when *McDougall, supra*, was decided, and those concerns remain far from resolved.

Michael F. Cavanagh

STATE OF MICHIGAN

SUPREME COURT


JOHANNA WOODARD, Individually and as
Next friend of AUSTIN D. WOODARD,
a Minor, and STEVEN WOODARD,

      Plaintiffs-Appellees
      and Cross-Appellants

v                                      No. 124994

JOSEPH R. CUSTER, M.D.,

      Defendant-Appellant
      and Cross-Appellee

and

MICHAEL K. LIPSCOMB, M.D.,
MICHELLE M. NYPAVER, M.D., and
MONA M. RISKALLA, M.D.,

      Defendants.
_____


JOHANNA WOODARD, Individually and as
Next Friend of AUSTIN D. WOODARD,
a Minor, and STEVEN WOODARD,

      Plaintiffs-Appellees
      and Cross-Appellants,

v                                        No. 124995

UNIVERSITY OF MICHIGAN MEDICAL
CENTER,

Defendant-Appellant
and Cross-Appellee.
_____

SHIRLEY HAMILTON, as Personal Representative
of the ESTATE OF ROSALIE ACKLEY,

    Plaintiff-Appellee,

and

BLUE CROSS BLUE SHIELD,

    Intervening Plaintiff,

v                                   No. 126275

MARK F. KULIGOWSKI, D.O.,

    Defendant-Appellant.
_____

MARKMAN, J. (*concurring*).

I write separately to set forth an additional argument in support of the majority's conclusion that only the one most relevant specialty and board certificate must match under MCL 600.2169(1), and to explain that although only the one most relevant specialty must match under § 2169(1), the trial court may require that other relevant specialties match pursuant to § 2169(2), § 2169(3), and MRE 702. I write also to respond to Chief Justice Taylor's concurrence's contention that this opinion is inconsistent with the majority opinion. I have also set forth an appendix that summarizes recent Michigan Supreme Court decisions in the increasingly complex area of medical malpractice.

2

ANALYSIS

MCL 600.2169(1)(a) requires a plaintiff's expert to have specialized "in *the same specialty*" as the defendant physician. And, if the defendant physician is a specialist who is board certified, § 2169(1)(a) requires the plaintiff's expert to be "board certified in *that* specialty." (Emphasis added.) In *Robinson v Detroit,* 462 Mich 439, 462; 613 NW2d 307 (2000), this Court held that the phrase "the proximate cause" as used in the governmental immunity act, MCL 691.1407(2), means "the one most immediate, efficient, and direct cause of the injury or damage . . . ." We explained that because "'the' is a definite article, and 'cause' is a singular noun, it is clear that the phrase 'the proximate cause' contemplates *one* cause." *Id.* (emphasis in original). The same is true here. That is, because "the" is a definite article, and "specialty" is a singular noun, the phrase "the same specialty" contemplates *one* specialty-- the most relevant specialty.[1] Therefore, where a defendant physician specializes in multiple specialties, § 2169(1)(a) requires an expert witness to specialize only in the same specialty engaged in by the defendant physician during the course of the alleged malpractice, i.e., the one most relevant specialty. And, if the defendant physician is board certified in "that

---

[1] I note that Chief Justice Taylor's concurrence does not even attempt to reconcile its position in this case that "*the* same *specialty*" means *multiple* specialties with this Court's decision in *Robinson* that "*the* proximate *cause*" means *one* cause. See also *Paige v City of Sterling Hts*, 476 Mich ___; ___ NW2d ___ (Docket No. 127912, decided July 31, 2006).

specialty"-- the one most relevant specialty-- the plaintiff's expert witness must also be board certified in that specialty.

As the majority opinion explains, the requirements of § 2169(1) are not the only requirements that a medical expert must satisfy in order to be able to testify. MCL 600.2169(2) provides:

> In determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, evaluate all of the following:
>
> (a) The educational and professional training of the expert witness.
>
> (b) The area of specialization of the expert witness.
>
> (c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.
>
> (d) The relevancy of the expert witness's testimony.

In addition, MCL 600.2169(3) specifically states, "This section does not limit the power of the trial court to disqualify an expert witness on grounds other than the qualifications set forth in this section." Finally, MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Therefore, although the fact that the defendant physician specializes in multiple specialties and the plaintiff's expert witness does not may not be considered under

4

§ 2169(1), it *may* be considered under § 2169(2) and MRE 702. For instance, if the defendant physician specializes in two specialties and both of these specialties are relevant, i.e., the defendant physician's actions were informed by both specialties at the time of the alleged malpractice, the trial court may well conclude that, although the plaintiff's expert witness is qualified under § 2169(1) because he specializes in the one most relevant specialty, he may not be qualified under § 2169(2) or MRE 702 because he does not specialize in both relevant specialties. Through the application of § 2169(1), as well as by the exercise of judicial discretion under § 2169(2) and MRE 702, plaintiffs are *not* obligated to produce experts matching irrelevant specialties of defendants, but they are obligated, in my judgment, to produce experts matching relevant specialties.

RESPONSE TO CHIEF JUSTICE TAYLOR'S CONCURRENCE

Chief Justice Taylor's concurrence contends that this concurrence is inconsistent with the majority opinion that I have written. This is simply incorrect. I agree completely with everything said in the majority opinion: (a) The majority opinion holds that irrelevant specialties do not have to match. I agree. (b) The majority opinion holds that under § 2169(1) only the one most relevant specialty must match. I agree. (c) The majority opinion holds that an individual expert must meet all of the requirements of § 2169(1) in order to testify; a group of experts cannot pool their expertise to collectively satisfy the requirements of § 2169(1). I agree. (d) The majority opinion holds that just because an expert is

5

qualified under § 2169(1) does not mean that the trial court cannot disqualify the expert on "other grounds." I agree.

I write separately only to explain that I believe that one of these "other grounds" for disqualification can be the failure of the plaintiff's expert to match *other* relevant specialties. Contrary to Chief Justice Taylor's concurrence's contention, there is nothing in the majority opinion that precludes this conclusion. While the majority opinion holds that under § 2169(1) only the one most relevant specialty must match, this does not mean that a different provision of law cannot require that other relevant specialties be matched.

Chief Justice Taylor's concurrence asserts that the majority opinion holds that "only one expert may be utilized" and the concurrence allows more. *Post* at 4. This is again incorrect. As I have explained, I agree completely with the majority opinion that an individual expert must meet all of the requirements of § 2169(1) in order to testify. Contrary to Chief Justice Taylor's concurrence, I do not believe that an assemblage of experts can join their expertise to collectively satisfy the requirements of § 2169(1). I further agree with the majority opinion that only one standard of practice or care was envisioned under § 2169(1), and, thus, the plaintiff need only produce one expert to testify about that standard, but, if a plaintiff wishes to, he is free to offer several different experts to testify regarding that relevant specialty, as long as each expert meets the criteria of § 2169(1).

Chief Justice Taylor's concurrence contends that because I believe that multiple *specialties* may be relevant, this must also mean that I share its view that a plaintiff can utilize multiple experts because it would be impossible for any one expert to meet the requirements of MCL 600.2169(1)(b). *Post* at 47 n 71. This provision requires the proposed expert to have "devoted a majority of his or her professional time" to practicing or teaching the specialty in which the defendant physician specializes. That is, Chief Justice Taylor's concurrence contends that because I believe that multiple specialties may be relevant, and because MCL 600.2169(1)(b) requires the proposed expert to have "devoted a majority of his or her professional time" to practicing or teaching the specialty in which the defendant physician specializes, I must necessarily agree with them that the plaintiff can utilize multiple experts because one expert cannot possibly devote a majority of his professional time to practicing or teaching multiple specialties.

However, Chief Justice Taylor's concurrence overlooks that I agree with the majority opinion that under § 2169(1) only the one most relevant specialty must match, and disagree with Chief Justice Taylor's concurrence that all specialties, however irrelevant, must match under § 2169(1). Because only the one most relevant specialty must match under § 2169(1), it is not at all impossible for an expert to meet the requirements of § 2169(1)(b). Moreover, contrary to Chief Justice Taylor's concurrence's contention, § 2169(1)(b) does not "preclude any expert from providing testimony regarding more than one specialty area." *Post* at 3. For instance, using Chief Justice Taylor's concurrence's hypothetical

7

defendant physician who specializes in cardiovascular surgery and nephrology and who negligently inserts a pacemaker, if the trial court determines that cardiovascular surgery is the one most relevant specialty, under § 2169(1)(a), the plaintiff's expert must specialize in cardiovascular surgery and, under § 2169(1)(b), he must have devoted a majority of his professional time practicing or teaching cardiovascular surgery. However, even if the plaintiff's expert meets the requirements of § 2169(1), the trial court may conclude that nephrology is also a relevant specialty and that, if the expert does not also specialize in nephrology, he is not qualified under either § 2169(2) or MRE 702. Again, there is nothing inconsistent with holding that an expert may be qualified under one provision of law, but is not qualified under a different provision. Moreover, if the plaintiff's expert devotes a majority of his professional time to practicing or teaching cardiovascular surgery and also specializes in nephrology, nothing precludes that expert from testifying about both cardiovascular surgery and nephrology because § 2169(1)(b) only applies to the one most relevant specialty.

Chief Justice Taylor's concurrence professes to concur with my concurring opinion. *Post* at 2. While this would be welcome, those who signed Chief Justice Taylor's opinion should understand my concurring opinion more clearly than they do. While this opinion and Chief Justice Taylor's concurrence are in agreement with the proposition that all relevant specialties must match, our analyses differ. While this opinion grounds this conclusion in § 2169(2) and MRE 702, Chief Justice Taylor's concurrence grounds this conclusion in § 2169(1). Of greater

8

practical significance, the analysis in this opinion, unlike that of Chief Justice Taylor's concurrence, cannot be separated from the majority opinion's proposition that no irrelevant specialties must match and that an individual expert must meet all of the requirements of § 2169(1) in order to testify.

Because Chief Justice Taylor's concurrence sows confusion regarding where the majority lies, I will attempt to clarify this. In my judgment, there is majority support for the following propositions:

(1) Irrelevant specialties do not have to match (Justices Cavanagh, Weaver, Kelly, and myself);

(2) Under § 2169(1), only the one most relevant specialty must match (Justices Cavanagh, Weaver, Kelly, and myself);

(3) An individual expert must meet all of the requirements of § 2169(1) in order to testify (Justices Cavanagh, Weaver, Kelly, and myself);

(4) An assemblage of experts cannot join their expertise to collectively satisfy the requirements of § 2169(1) (Justices Cavanagh, Weaver, Kelly, and myself);

(5) That an expert is qualified under § 2169(1) does not mean that the trial court cannot disqualify the expert on other grounds (Chief Justice Taylor and Justices Cavanagh, Weaver, Kelly, Corrigan, Young, and myself);

(6) Other relevant specialties may have to match under § 2169(2) and MRE 702 (Chief Justice Taylor and Justices Corrigan, Young, and myself).

Stephen J. Markman

9

<u>APPENDIX</u>

In light of the growing complexity of medical malpractice statutes in Michigan and the resultant case law, the following is designed as a brief summary of recent Michigan Supreme Court decisions in this area.

(1) If the claim pertains to an action that occurred within the course of a professional medical relationship and the claim raises questions of medical judgment beyond the realm of common knowledge and experience, the claim sounds in medical malpractice, not ordinary negligence. *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411; 684 NW2d 864 (2004).

(2) The period of limitations is two years for an action charging malpractice. MCL 600.5805(6).

(3) A person cannot commence a medical malpractice action without first giving the defendant written notice. MCL 600.2912b(1).

(4) No suit can be commenced for 182 days after written notice is given. MCL 600.2912b(1).

(5) The 182-day no-suit period can be shortened to 154 days if the defendant does not provide a written response within 154 days. MCL 600.2912b(8). The 182-day no-suit period can be shortened to 91 days under certain circumstances. MCL 600.2912b(3). Finally, the 182-day no-suit period can be shortened to some other number of days if the defendant informs the plaintiff in writing that the defendant does not intend to settle the claim. MCL 600.2912b(9).

10

(6) If the notice of intent is given 182 days or less before the end of the two-year limitations period, this tolls the two-year limitations period for 182 days. MCL 600.5856(c); *Omelenchuk v City of Warren,* 461 Mich 567; 609 NW2d 177 (2000).

(7) A notice of intent must include: (a) the factual basis for the claim; (b) the applicable standard of practice or care alleged by the claimant; (c) the manner in which it is claimed that the applicable standard of practice or care was breached by the health professional or health facility; (d) the alleged action that should have been taken to achieve compliance with the alleged standard of practice or care; (e) the manner in which it is alleged the breach of the standard of practice or care was the proximate cause of the injury claimed in the notice; and (f) the names of all health professionals and health facilities the claimant is notifying under this section in relation to the claim. MCL 600.2912b(4); *Roberts v Mecosta Gen Hosp (After Remand),* 470 Mich 679; 684 NW2d 711 (2004).

(8) A notice of intent that is not in full compliance with MCL 600.2912b(4) does not toll the limitations period. MCL 600.5856(c); *Roberts, supra*.

(9) The tacking or addition of successive 182-day periods is prohibited. MCL 600.2912b(6).

(10) A second notice of intent can toll the period of limitations if the first notice of intent did not toll the period of limitations. MCL 600.2912b(6); *Mayberry v Gen Orthopedics, PC,* 474 Mich 1; 704 NW2d 69 (2005).

(11) A complaint alleging medical malpractice that is filed before the expiration of the notice period provided by MCL 600.2912b does not toll the period of limitations. MCL 600.2912b(1); *Burton v Reed City Hosp Corp,* 471 Mich 745; 691 NW2d 424 (2005).

(12) If a person dies before the period of limitations has run or within 30 days after the period of limitations has run, the personal representative of the decedent's estate can file a wrongful death action up to two years after letters of authority are issued, as long as the action is brought within three years after the period of limitations has run. MCL 600.5852.

(13) A successor personal representative has two years after appointment to file an action on behalf of the estate as long as the action is filed within three years after the period of limitations has run. MCL 600.5852; *Eggleston v Bio-Medical Applications of Detroit, Inc,* 468 Mich 29; 658 NW2d 139 (2003).

(14) A notice of intent does not toll the additional period permitted for filing wrongful death actions under the wrongful death saving provision, MCL 600.5852. MCL 600.5856(c); *Waltz v Wyse,* 469 Mich 642; 677 NW2d 813 (2004).

(15) A plaintiff is required to file with the complaint an affidavit of merit signed by an expert who the plaintiff's attorney reasonably believes meets the requirements of MCL 600.2169. MCL 600.2912d(1); *Grossman v Brown,* 470 Mich 593; 685 NW2d 198 (2004).

(16) A complaint alleging medical malpractice that is not accompanied by the statutorily required affidavit of merit does not toll the limitations period. MCL 600.2912d(1); *Scarsella v Pollak,* 461 Mich 547; 607 NW2d 711 (2000).

(17) If a defendant physician is a specialist, the plaintiff's expert witness must have specialized in the same specialty as the defendant physician at the time of the occurrence that is the basis for the action. MCL 600.2169(1)(a); *Woodard v Custer (Woodard II),* ___ Mich ___ ; ___ NW2d ___ (Docket Nos. 124994, 124995, 126275, decided July ___, 2006).

(18) If a defendant physician specializes in a subspecialty, the plaintiff's expert witness must have specialized in the same subspecialty as the defendant physician at the time of the occurrence that is the basis for the action. MCL 600.2169(1)(a); *Woodard II, supra.*

(19) If the defendant physician is a specialist who is board certified, the plaintiff's expert witness must be a specialist who is board certified in that specialty. MCL 600.2169(1)(a); *Halloran v Bhan*, 470 Mich 572; 683 NW2d 129 (2004).

(20) If a defendant physician has received a certificate of special qualifications, the plaintiff's expert witness must have received the same certificate of special qualifications. MCL 600.2169(1)(a); *Woodard II.*

(21) Where a defendant physician specializes in several specialties, the plaintiff's expert witness must have specialized in the same specialty as that engaged in by the defendant physician during the course of the alleged

13

malpractice, i.e., the one most relevant specialty. MCL 600.2169(1)(a); *Woodard II.*

(22) Where a defendant physician is board certified in several specialties, the plaintiff's expert witness must be board certified in the specialty that the defendant physician was engaged in during the course of the alleged malpractice, i.e., the one most relevant specialty. MCL 600.2169(1)(a); *Woodard II.*

(23) If the defendant physician is a specialist, the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty. MCL 600.2169(1)(b); *Woodard II.*

(24) If the defendant physician specializes in a subspecialty, the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the subspecialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant subspecialty. MCL 600.2169(1)(b); *Woodard II.*

(25) Because an expert is qualified under MCL 600.2169(1) does not mean that the trial court cannot disqualify the expert on other grounds. MCL 600.2169(2); § 2169(3); MCL 600.2955; MRE 702; *Woodard II.*

14

STATE OF MICHIGAN

SUPREME COURT

JOHANNA WOODARD, Individually
and as Next Friend of AUSTIN D.
WOODARD, a Minor, and STEVEN
WOODARD,

      Plaintiffs-Appellees
      and Cross-Appellants,

v                                          No. 124994

JOSEPH R. CUSTER, M.D.,

      Defendant-Appellant
      and Cross-Appellee,

and

MICHAEL K. LIPSCOMB, M.D.,
MICHELLE M. NYPAVER, M.D., and
MONA M. RISKALLA, M.D.,

      Defendants.
_____/

JOHANNA WOODARD, Individually
and as Next Friend of AUSTIN D.
WOODARD, a Minor, and STEVEN
WOODARD,

      Plaintiffs-Appellees, and
      Cross-Appellants

v                                          No. 124995

UNIVERSITY OF MICHIGAN MEDICAL
CENTER,

Defendant-Appellant, and
Cross-Appellee

_____/

SHIRLEY HAMILTON, as Personal
Representative of the Estate of
ROSALIE ACKLEY, Deceased,

     Plaintiff-Appellee,

v                                            No. 126275

BLUE CROSS/BLUE SHIELD OF
MICHIGAN,

     Intervening Plaintiff,

v

MARK F. KULIGOWSKI, D.O.,

     Defendant-Appellant.

_____

TAYLOR, C.J. (*concurring in the result only*).

We concur in that portion of Justice Markman's concurrence stating that a defendant physician's multiple areas of specialty "may be considered under § 2169(2) and MRE 702" in barring the testimony of an expert witness who does not possess the same multiple areas of medical specialty. *Ante* at 5 (emphasis omitted). Thus, we agree with Justice Markman's concurring opinion that there can be more than one relevant area of medical specialty at issue in establishing a breach of the applicable standard of care, and that a proffered expert may be excluded on that basis. At first glance, Justice Markman's concurrence appears to

2

be inconsistent with his lead opinion because the lead opinion would only permit evidence of a singular medical specialty to be adduced. The lead opinion concludes that the trial court must choose *one*, and only one, specialty that is relevant to establishing the appropriate standard of care and precludes the parties from introducing expert testimony with regard to any other relevant specialty. Justice Markman's concurrence, however, concludes, as we do, that *more than one* medical specialty may be germane in establishing the requisite standard of care and that plaintiffs may be required to introduce expert testimony regarding other relevant specialties.

Furthermore, we agree with Justice Markman's concurring opinion that the practice and teaching requirements in MCL 600.2169(1)(b) preclude any expert from providing testimony regarding more than one specialty area. Thus, because he opines that plaintiffs can be obligated to produce expert testimony regarding more than one specialty area, and every expert may only testify regarding one specialty area, it logically follows that plaintiffs *must* be able to utilize *more than one* expert to establish a breach of the applicable standard of care, a conclusion with which we wholeheartedly agree.

Thus, we believe that Justice Markman's "concurrence" more closely resembles this opinion than the lead opinion. We therefore concur with his concurrence insofar as it concludes that there can be more than one specialty germane to establishing the appropriate standard of care, and also insofar as it implicitly stands for the conclusion that multiple experts may be utilized in

3

establishing a breach of the appropriate standard of care.[1]  As such, there are four votes for these two conclusions of law, just as the lead opinion purports to carry four votes for the conclusions that there can be only one relevant specialty and that only one expert may be utilized.[2]  However, in this peculiar, perhaps unprecedented, situation, we conclude that Justice Markman's concurrence, insofar as it concludes that multiple specialties may be relevant and that multiple experts may be utilized, is the law. Certainly, the fact that Justice Markman lends his signature to two incompatible opinions does not lead to the conclusion that he may cast two separate votes. Rather, because his concurrence was written conceptually later in time than his lead opinion, his concurrence is the law.  While some of our analysis goes beyond these two points of his concurrence, it is submitted as the better approach to the statute under review and may be of use in later cases.

---

[1] We do not, however, agree with his conclusion that the trial court, rather than the parties themselves or the jury, is to determine which specialties are germane.  We also do not join in his appendix, because much of its discussion is obiter dictum.

[2] The lead opinion asserts that it has four votes, apparently believing that stating it makes it so.  However, as we have pointed out, the inconsistencies between Justice Markman's concurrence and his lead opinion evince that the lead opinion does not, in fact, carry four votes.  Further evidence that Justice Markman's concurrence is not in harmony with the lead opinion is that he had to file it *because* none of the other justices signing his lead opinion agree with his position.

INTRODUCTION

In these medical malpractice cases, we granted leave to appeal to consider whether plaintiffs' proposed expert witnesses qualify under MCL 600.2169 to testify regarding what standards of care the defendant doctors should have met. The trial courts in both cases granted defendants' motions to strike plaintiffs' proposed experts on the basis that they were not qualified under MCL 600.2169. In *Woodard*, a majority of the Court of Appeals affirmed the trial court's ruling on this issue.[3] In *Hamilton*, the Court of Appeals reversed the trial court's judgment.[4] We conclude in both cases that plaintiffs' proposed experts do not meet the requirements of MCL 600.2169 and, therefore, that plaintiffs have failed to present expert testimony sufficient to support their claims. Therefore, in *Woodard*, we affirm the part of the Court of Appeals judgment that held that plaintiffs' proposed expert is not qualified and remand this case to the circuit court for reinstatement of its order dismissing plaintiffs' claim with prejudice. In *Hamilton*, we reverse the Court of Appeals judgment that plaintiff's proposed expert is qualified and remand

---

[3] Unpublished opinion per curiam of the Court of Appeals and separate unpublished opinion concurring in part and dissenting in part by Meter, J., issued October 21, 2003 (Docket Nos. 239868, 239869). A separate majority, however, determined that the doctrine of res ipsa loquitur applied to obviate plaintiffs' need to present expert testimony. Unpublished opinion concurring in part and dissenting in part by Meter, J., and unpublished dissenting opinion by Borrello, J. We have previously reversed that portion of the Court of Appeals holding in *Woodard v Custer,* 473 Mich 1; 702 NW2d 522 (2005) (*Woodard I*).

[4] 261 Mich App 608; 684 NW2d 366 (2004).

5

this case to the circuit court for reinstatement of its order granting a directed verdict to defendant.

## I.  FACTS AND PROCEEDINGS BELOW

### A.  *WOODARD v CUSTER*

We summarized the facts underlying this case in our recent decision in *Woodard I*:

> Plaintiffs' fifteen-day-old son was admitted to the Pediatric Intensive Care Unit (PICU) at the University of Michigan Hospital, where he was treated for a respiratory problem. During his stay in the PICU, he was under the care of Dr. Joseph R. Custer, the Director of Pediatric Critical Care Medicine. When the infant was moved to the general hospital ward, physicians in that ward discovered that both of the infant's legs were fractured. Plaintiffs sued Dr. Custer and the hospital, alleging that the fractures were the result of negligent medical procedures, namely, the improper placement of an arterial line in the femoral vein of the infant's right leg and the improper placement of a venous catheter in the infant's left leg.

> Defendant physician is board-certified in pediatrics and has certificates of special qualifications in pediatric critical care medicine and neonatal-perinatal medicine. Plaintiffs' proposed expert witness, who signed plaintiffs' affidavit of merit, is board-certified in pediatrics, but does not have any certificates of special qualifications.

> Before discovery, the trial court denied defendants' motion for summary disposition, concluding that plaintiffs' attorney had a "reasonable belief" under MCL 600.2912d(1) that plaintiffs' proposed expert witness was qualified under MCL 600.2169 to testify against the defendant physician, and, thus, that plaintiffs' affidavit of merit was sufficient. After discovery, the trial court granted defendants' motion to strike plaintiffs' expert witness on the basis that he was not actually qualified under MCL 600.2169 to testify against the defendant physician. The trial court dismissed plaintiffs' claim with prejudice, concluding that plaintiffs could not reach a jury without expert testimony.

6

The Court of Appeals affirmed the trial court's ruling that plaintiffs' proposed expert witness was not qualified under MCL 600.2169 to testify against the defendant physician (Judge Borrello dissented on this issue), but reversed the trial court's dismissal on the basis that expert testimony was unnecessary under the doctrine of res ipsa loquitur, i.e., an inference of negligence may be drawn from the fact that the infant was admitted to the PICU with healthy legs and discharged from the PICU with fractured legs (Judge Talbot dissented on this issue).[5] The case was remanded for trial.

Defendants sought leave to appeal the Court of Appeals decision that res ipsa loquitur applies and that expert testimony was not necessary. Plaintiffs sought leave to cross-appeal the Court of Appeals decision that their proposed expert witness was not qualified under MCL 600.2169 to testify against the defendant physician. We heard oral argument on whether to grant the applications or take other peremptory action permitted by MCR 7.302(G)(1).[6] [*Woodard I, supra,* 473 Mich at 3-5.]

After hearing oral argument, we issued our opinion in *Woodard I*, which concerned only defendants' application for leave to appeal. In that opinion, we reversed the Court of Appeals decision that res ipsa loquitur applied to relieve plaintiffs of the need to present expert testimony.[7] Because our decision in *Woodard I* required plaintiffs to produce expert testimony to support their claims, we simultaneously granted plaintiffs' cross-application for leave to appeal the

---

[5] Unpublished opinion per curiam of the Court of Appeals and separate opinion concurring in part and dissenting in part by Meter, J., and separate dissenting opinion by Borrello, J., decided October 21, 2003 (Docket Nos. 239868, 239869).

[6] 471 Mich 890 (2004).

[7] *Woodard I, supra,* 473 Mich at 9-10.

Court of Appeals determination that their proposed expert was not qualified under MCL 600.2169.[8]

## B. *HAMILTON v KULIGOWSKI*

Between 1992 and 1998, defendant Dr. Mark F. Kuligowski treated Rosalie Ackley for hypertension, diabetes, weight control, and a thyroid ailment. On March 19, 1998, Ackley, who was in her seventies, complained of numbness and weakness in her left arm. She further informed Kuligowski that she had been diagnosed with a blockage in her neck several years earlier. After detecting abnormal sounds in Ackley's carotid artery during a physical examination, Kuligowski suspected that she had suffered a minor stroke and possibly suffered from bilateral carotid artery disease. Although he ordered a bilateral carotid Doppler echocardiography,[9] Kuligowski advised Ackley that there was no cause for immediate concern. Three days later, Ackley suffered a stroke. She subsequently died in December 2000.

Plaintiff, Ackley's daughter, filed the instant medical malpractice action on behalf of Ackley's estate alleging that Kuligowski was negligent in failing to recognize Ackley's prestroke symptoms and render appropriate treatment. Kuligowski is board-certified in internal medicine, and primarily sees geriatric

---

[8] 473 Mich 856 (2005).

[9] A "Doppler echocardiography" is an "ultrasound used to measure cardiovascular blood flow velocity for diagnostic purposes (as for evaluating valve function)." *Merriam Webster's Medline Plus*, <http://www2.merrriam-webster.com/cgi-bin/mwmednlm > (accessed January 9, 2006).

patients. In support of her claims, plaintiff called as a witness a proposed expert who, like Kuligowski, is board-certified in internal medicine. Plaintiff's proposed expert spends half of his professional time in his office treating internal medicine and infectious disease patients and the other half in a hospital treating primarily infectious disease patients.

Kuligowski moved to strike plaintiff's proposed expert, arguing that he was not qualified under MCL 600.2169 to testify with regard to the appropriate standard of care because he specializes in infectious diseases while Kuligowski himself specializes in general internal medicine. The circuit court granted Kuligowski's motion, ruling that plaintiff's proposed expert was not qualified under MCL 600.2169(1)(b) because he did not devote a majority of his time to the practice of general internal medicine but, instead, to the treatment of infectious diseases. Thereafter, the circuit court also granted Kuligowski's motion for a directed verdict on the basis that plaintiff did not have a qualified expert to support her claims.

The Court of Appeals reversed the trial court's ruling and held that plaintiff's proposed expert was qualified under MCL 600.2169. The panel concluded that the treatment of infectious diseases was merely a "subspecialty" within the broader specialty of internal medicine, and that the statute does not require the matching of subspecialties. It further concluded that, because the treatment of infectious diseases is merely a branch of internal medicine with a narrower focus, plaintiff's proposed expert did, in fact, devote a majority of his

9

time to the practice of internal medicine. The Court of Appeals therefore remanded the case for further proceedings.[10]

We granted Kuligowski's application for leave to appeal.[11]

## II. STANDARD OF REVIEW

These cases involve the interpretation of MCL 600.2169. We review questions of statutory interpretation de novo.[12] As always, our goal is to discern and give effect to the legislative intent that is expressed in the statutory language.[13] If the statutory language is unambiguous, then the Legislature's intent is clear and we must enforce the statute as written.[14]

## III. ANALYSIS

Before 1986, the question whether a plaintiff's proposed expert was qualified to testify with regard to the appropriate standard of care in a medical malpractice case was governed by MRE 702.[15] This evidentiary rule provided trial

---

[10] 261 Mich App 608; 684 NW2d 366 (2004).

[11] 473 Mich 858 (2005).

[12] *Grossman v Brown*, 470 Mich 593, 598; 685 NW2d 198 (2004).

[13] *Halloran v Bhan,* 470 Mich 572, 576; 683 NW2d 129 (2004).

[14] *Mayor of Lansing v Pub Service Comm,* 470 Mich 154, 157; 680 NW2d 840 (2004).

[15] At the time the first version of MCL 600.2169 was enacted in 1986, MRE 702 provided:

(continued…)

10

courts with broad discretion to qualify proposed experts if they determined that scientific, technical, or other specialized knowledge was needed to assist the trier of fact in determining the appropriate standard of care the defendant doctor should have met and that the proposed expert was qualified to offer such testimony on the basis of the expert's "'knowledge, skill, experience, training, or education.'"[16]

However, as we discussed in *McDougall v Schanz,*[17] our Legislature ultimately deemed MRE 702 ineffective in assuring that proposed experts

_____

(…continued)

> If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

A recent amendment of MRE 702, which became effective on January 1, 2004, further limits a trial court's discretion to qualify a proposed expert by adding that the court may only admit the expert's testimony if:

> (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As stated in the staff comments that follow MRE 702, the purpose of this amendment was to emphasize the trial court's role as gatekeeper to exclude expert testimony that is unreliable because it is based on unproven theories or methodologies in conformance with *Daubert v Merrell Dow Pharmaceuticals, Inc,* 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), and *Kumho Tire Co, Ltd v Carmichael,* 526 US 137; 119 S Ct 1167; 143 L Ed 2d 238 (1999).

[16] See *McDougall v Schanz,* 461 Mich 15, 25; 597 NW2d 148 (1999), quoting MRE 702.

[17] *Id.*

presented reliable testimony in medical malpractice cases.[18]  The primary

deficiency with MRE 702 was that it failed to ensure that trial judges excluded

proposed experts who were not actively involved in the medical field about which

they sought to testify.[19]  Therefore, in 1986 our Legislature enacted the first

version of MCL 600.2169, which was designed to limit a trial court's discretion to

qualify experts in medical malpractice cases by systematically "preclud[ing]

---

[18] *Id*. at 25, 36.

[19] *McDougall, supra*, 461 Mich at 25 n 9, quoting the dissenting Court of Appeals judge's opinion in *McDougall,* 218 Mich App 501, 509 n 1; 554 NW2d 56 (1996) (Taylor, P.J., dissenting), quoting the *Report of the Senate Select Committee on Civil Justice Reform*, issued September 26, 1995:

> "As a practical matter, in many courts merely a license to practice medicine is needed to become a medical expert on an issue.
>
> "This has given rise to a group of national professional witnesses who travel the country routinely testifying for plaintiffs in malpractice actions. These 'hired guns' advertise extensively in professional journals and compete fiercely with each other for the expert witness business. For many, testifying is a full-time occupation and they rarely actually engage in the practice of medicine. There is a perception that these so-called expert witnesses will testify to whatever someone pays them to testify about.
>
> "This proposal is designed to make sure that expert witnesses actually practice or teach medicine. In other words, to make sure that experts will have firsthand practical expertise in the subject matter about which they are testifying. In particular, with the malpractice crisis facing high-risk specialists, such as neurosurgeons, orthopedic surgeons and ob/gyns, this reform is necessary to insure that in malpractice suits against specialists the expert witnesses actually practice in the same speciality. This will protect the integrity of our judicial system by requiring real experts instead of 'hired guns.'"

certain witnesses from testifying solely on the basis of the witness' lack of practice or teaching experience . . . ."[20]

Our Legislature further limited the discretion of trial judges to qualify proposed experts in 1993 when it enacted 1993 PA 78, which amended MCL 600.2169 to set forth even more restrictive criteria than the 1986 version.[21] In its current form, MCL 600.2169 now provides, in pertinent part:

> (1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.
>
> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:
>
> (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.
>
> (*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if

---

[20] *McDougall, supra,* 461 Mich at 24-25.

[21] *McDougall, supra,* 461 Mich at 21 n 2.

that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.[22]

\* \* \*

(3) This section does not limit the power of the trial court to disqualify an expert witness on grounds other than the qualifications set forth in this section.

Accordingly, these provisions set forth a number of specific, minimum criteria that a proposed expert must satisfy in order to testify regarding the appropriate standard of care in a medical malpractice case.[23] The first of these, of

---

[22] Like MCL 600.2169(1)(a) and (b), which set forth the minimum criteria for proposed experts who will testify regarding the standard of care that a specialist should have followed, MCL 600.2169(1)(c) sets forth criteria for cases involving general practitioners. Because both these cases involve specialists, however, MCL 600.2169(1)(c) is not germane to our decision. Additionally, MCL 600.2169(2) sets forth specific criteria that a trial court must consider when determining whether *any* proposed expert in a medical malpractice case—not just those offered to testify regarding the appropriate standard of care, but such matters as causation, and so forth—is qualified to testify. *Halloran, supra,* 470 Mich at 578 n 6. However, because both proposed experts in these cases sought to testify with regard to the appropriate standard of care, their qualification is governed by the more specific requirements of MCL 600.2169(1). *Id.* Therefore, MCL 600.2169(2) is also not relevant to our decision in these cases.

[23] We agree with the lead opinion that, although we refer to MCL 600.2169(1) throughout this opinion as imposing requirements on proposed plaintiff's experts, the statute applies equally to standard of care experts offered by the defendant because it applies to standard of care testimony offered "against" and on "behalf" of the defendant doctor. The lead opinion seems to think we disagree with this, *ante* at 9 n 5, but that is not the case. Instead, what we point out later in this opinion is that, contrary to the lead opinion's apparent belief, it will not always be defendants that assert that multiple specialties are germane to establishing the standard of care that the defendant doctor should have exercised. Rather, we believe there will be circumstances in which plaintiffs will also assert that more than one of the defendant doctor's specialty areas are germane to understanding the standard of care the defendant doctor should have exercised.

14

course, is that the proposed expert must be a licensed health professional.[24]   The statute then goes on to set forth several additional requirements aimed at ensuring that the proposed expert possesses the same professional credentials as the defendant doctor, thereby assuring that the proposed expert is familiar with the standards and techniques that should typically be followed by a physician in the defendant's position.  In particular, the statute requires that if the defendant doctor is a specialist, the proposed expert must also be a specialist in the same specialty. Further, if the defendant doctor is a board-certified specialist, the proposed expert must also be a board-certified specialist in the same specialty.[25]

Moreover, in addition to requiring that the proposed expert possess the same specialty qualifications as the defendant doctor, the statute, unlike MRE 702, also seeks to ensure that the proposed expert possesses actual, recent experience in that specialty area.  It does this by requiring that the proposed expert have devoted a majority of his or her professional time during the year preceding the alleged malpractice to either the active clinical practice of the defendant's specialty area or to the instruction of that specialty area.[26]

Finally, the statute makes clear that the above requirements represent only the bare *minimum* that a proposed expert must meet in order to testify regarding

---

[24] MCL 600.2169(1).

[25] MCL 600.2169(1)(a).

[26] MCL 600.2169(1)(b).

15

the standard of care. It does this by explicitly granting a trial court the discretion to disqualify a proposed expert for other, unenumerated reasons;[27] for example, if the trial court determines that the proposed expert's testimony is unreliable under MCL 600.2955[28] or the three factors recently added to MRE 702.

## A. "SPECIALIST" DEFINED

As is obvious from the above synopsis of the statute, the determination whether a proposed expert is minimally qualified to testify regarding the appropriate standard of care often turns on whether the defendant doctor qualifies as a specialist in a given area of medicine, thereby requiring the proposed expert to likewise qualify as a specialist in that area. MCL 600.2169, however, does not define the term "specialist." It therefore falls upon us to accord a meaning to that term that best comports with the Legislature's intent. In doing so, we are guided by two principles. The first is that MCL 600.2169 does not stand alone. Rather, "[i]t exists and must be read in context with the entire act, and the words and phrases used there must be assigned such meanings as are in harmony with the

---

[27] MCL 600.2169(3).

[28] MCL 600.2955 requires a trial court to determine whether a scientific opinion rendered by an otherwise qualified expert is reliable by assessing, among other things, whether the opinion and its basis have been subjected to testing and peer review publication. MCL 600.2955(3) specifically provides that the provisions of MCL 600.2955 are in addition to the criteria for expert testimony in medical malpractice actions provided in MCL 600.2169.

16

whole of the statute . . . ."[29]  The second comes from the Legislature's decree in MCL 8.3a that undefined words or phrases shall be given their common and ordinary meaning, but that technical words and phrases, and legal terms of art, are to be construed according to their peculiar and appropriate meaning.[30]

Applying the first of these principles, we first note that some indication regarding the meaning of the term "specialist" can be gleaned from the relationship of MCL 600.2169 to MCL 600.2912d(1).[31]  The latter statute, in conjunction with MCL 600.2169, requires the plaintiff's counsel to file an affidavit of merit with the complaint that is signed by a physician who counsel *reasonably believes* specializes in the same specialty as the defendant physician.[32] Accordingly, the Legislature intended for a plaintiff to be able to form a

___

[29] *Arrowhead Dev Co v Livingston Co Rd Comm*, 413 Mich 505, 516; 322 NW2d 702 (1982).

[30] MCL 8.3a provides:

> All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.

[31] MCL 600.2912d(1) provides in relevant part:

> [T]he plaintiff in an action alleging medical malpractice or, if the plaintiff is represented by an attorney, the plaintiff's attorney shall file with the complaint an affidavit of merit signed by a health professional who the plaintiff's attorney reasonably believes meets the requirements for an expert witness under section 2169.

[32] *Grossman, supra,* 470 Mich at 596.

reasonable belief regarding whether a defendant doctor is a specialist at the commencement of the action—i.e., before the discovery process. Therefore, it is reasonable to conclude that the Legislature intended for the determination whether a defendant doctor is a specialist to correlate to how the defendant doctor subjectively represents himself or herself; in other words, whether the doctor holds himself or herself out as a specialist.

Further indication of what the Legislature intended when it used the term "specialist" can be gleaned from dictionary definitions. Because MCL 600.2169 uses the term "specialist" in the context of a *medical* specialist, it is a technical term that must be accorded its "peculiar and appropriate meaning" within the medical community. MCL 8.3a. Accordingly, it is necessary in this instance for us to refer to medical, rather than lay, dictionaries.[33]

Some medical dictionaries base the determination whether a doctor is a specialist on how that doctor allocates time during practice; in other words, whether that doctor limits his or her practice primarily to a particular branch of

---

[33] We realize that in *Cox v Flint Bd of Hosp Managers,* 467 Mich 1, 18-19; 651 NW2d 356 (2002), quoting *Random House Webster's College Dictionary* (1997), this Court defined the term "specialist" as "'a medical practitioner who deals only with a particular class of diseases, conditions, patients, etc.'" There, we listed several medical terms with their definitions as a reference for the issue under discussion in that case: the scope of a nurse's responsibilities. *Id.* Accordingly, we are not bound by this dictum, particularly where we resolved that case on another ground.

18

medicine or surgery, or to a certain class of patients, organs, or diseases.[34]  Other

medical dictionaries, however, define a specialist not according to how the doctor

allocates time, but rather according to whether the doctor has advanced training or

knowledge in a specific branch of medicine or surgery, or a certain class of

patients, organs, or diseases.[35]

---

[34] See *Dorland's Illustrated Medical Dictionary* (28th ed), defining a "specialist" as "a physician whose practice is limited to a particular branch of medicine or surgery, especially one who, by virtue of advanced training, is certified by a specialty board as being qualified to so limit his practice."  Accord *Gould Medical Dictionary* (3d ed), which similarly defines a "specialist" as "[a] physician or surgeon who limits his practice to certain diseases, or to the diseases of a single organ or class, or to a certain type of therapy . . . ."  See also *Stedman's Medical Dictionary* (26th ed), defining a "specialist" as "[o]ne who devotes professional attention to a particular specialty or subject area," and a "specialty" as "[t]he particular subject area or branch of medical science to which one devotes professional attention."

[35] See *Taber's Cyclopedic Medical Dictionary* (18th ed), which defines "specialist" as

> [a] dentist, nurse, physician, or other health professional who has advanced education and training in one clinical area of practice such as internal medicine, pediatrics, surgery, ophthalmology, neurology, maternal and child health, or cardiology.  In most specialized areas of health care, there are organizations offering qualifying examinations.  When an individual meets all of the criteria of such a board, he or she is called "board certified" in that area.

See also *Mosby's Medical Dictionary* (6th ed), which defines "specialist" as "a health care professional who practices a specialty."  It then defines "specialty" as

> a branch of medicine or nursing in which the professional is specially qualified to practice by having attended an advanced program of study, by having passed an examination given by an
>
> (continued…)

19

Thus, taking into consideration these technical definitions of the term "specialty," as well as the meaning that can be ascribed to it from the relationship of MCL 600.2169 to MCL 600.2912d(1), we conclude that the Legislature intended the term "specialist" as used in MCL 600.2169 to denote a physician who holds himself or herself out as either (1) limiting his or her practice primarily to a particular branch of medicine or surgery, or to a certain class of patients, organs, or diseases, or (2) having advanced training or knowledge in a specific branch of medicine or surgery, or a certain class of patients, organs, or diseases.[36]

We note at this point that many areas of specialization contain narrower, more limited areas within them. For instance, a physician who specializes in pediatrics can focus on general pediatric care, or can further concentrate on the more limited fields of pediatric critical care or neonatal-perinatal care. Similarly,

---

(…continued)
> organization of the members of the specialty, or by having gained experience through extensive practice in the specialty.

[36] In their briefs filed in this Court, the plaintiffs in both *Woodard* and *Hamilton*, as well as several of their amici, have argued emphatically that a "specialty" area must be defined as being synonymous with the areas of medicine in which a doctor can obtain board certification from either the American Board of Medical Specialties (ABMS) or the American Osteopathic Association (AOA). In support of this argument, they rely on the Legislature's mandate in MCL 600.2169(1)(a) that if the defendant doctor is a board-certified specialist, the proposed expert witness "must be a specialist who is *board certified in that specialty.*" (Emphasis added.) We disagree. Although this language indicates that specialty areas can overlap with areas in which a doctor can obtain board certification, it in no way limits the definition of specialty to only those areas. Moreover, the above definitions of the term "specialist" from *Taber's* and *Dorland's* make clear that the areas of medicine in which a doctor can specialize are not limited only to those in which a doctor can obtain board certification.

20

a physician who specializes in internal medicine can focus on general internal medicine or further concentrate his or her practice on any one of numerous, more limited fields such as cardiology, infectious diseases, gastroenterology, nephrology, and so forth. Plaintiffs maintain that the term "specialty" refers only to those areas of medicine that are recognized and designated as such by the American Board of Medical Specialties (ABMS) and the American Osteopathic Association (AOA). Under the ABMS/AOA framework, more generalized fields are termed "specialties" and more limited fields are termed "subspecialties." Thus, plaintiffs argue that their proposed experts' qualifications and the defendant doctors' qualifications need only match at the broader, more generalized level. They assert that the narrower, more focused areas are not specialties but "subspecialties" under the ABMS/AOA framework and that the language of MCL 600.2169 does not contemplate subspecialties.

We reject this assertion. The plain language of MCL 600.2169(1)(a) is completely devoid of any indication that the Legislature intended that a physician's "specialty" be circumscribed by the designations given by the ABMS and the AOA. Clearly, the unambiguous language of MCL 600.2169(1)(a) contemplates board-certified specialists as well as non-board-certified specialists. Because the statute permits a physician to be a "specialist" without board certification of *any variety,* there is no basis to conclude that the designations given by optional certifying organizations dictate a physician's "specialist"

21

status.[37]   Moreover, permitting the "specialty" designations given by the ABMS and the AOA to determine a physician's specialty would render MCL 600.2169(1)(c) nugatory.   Because both certifying boards award specialty certification in family medicine,[38] every general practitioner would be considered a "specialist" and subject to the expert witness requirements of MCL 600.2169(1)(a) instead of the expert witness requirements applicable to generalists under § 2169(1)(c).

Instead, we turn to the generally accepted technical meaning of the term "specialty," which encompasses narrower, more focused areas of medical practice, qualifying them as specialties in and of themselves.[39]  Thus, because the broader, more generalized areas and the narrower, more limited areas within them both constitute specialties under the accepted technical meaning of the word

---

[37] As amicus ABMS acknowledges in its brief, a physician need not be certified in a particular area of medicine in order to practice it.  Thus, certifying organizations such as the ABMS do not control a physician's practice area.  Such organizations develop and administer various benchmarks of competency for those physicians who *voluntarily elect* to be certified in their chosen areas of specialty.

[38] The American Board of Family Medicine is a member board of the ABMS.   See <https://www.theabfm.org> (accessed April 20, 2006).   The American Osteopathic Board of Family Physicians is a member board of the AOA.  See <http://www.aobfp.org/home.html> (accessed April 20, 2006).

[39] Our construction of the term "specialty" as also encompassing so-called "subspecialties" is consistent with the technical meaning of the term "subspecialty," which is defined as "a subordinate field of specialization." *Merriam Webster's Medline Plus*, <http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=subspecialty> (accessed January 9, 2006).

22

"specialty," a plaintiff's proposed expert must match the defendant doctor's qualifications at both levels.[40]

## B. "BOARD-CERTIFIED" DEFINED

Once it is determined that a defendant doctor qualifies as a specialist in a given area, the next inquiry is whether he or she also qualifies as a board-certified specialist in that area.  Before defining what it means to be board-certified, however, one point bears emphasis.  That is that the statute does not require the matching of board certifications in and of themselves.  Rather, it only makes board certifications germane if the defendant doctor is a "*specialist* who is board certified."  Accordingly, the fact that a defendant doctor has obtained a board certification in a given area is irrelevant to the issue of credential matching unless the defendant doctor first qualifies as a specialist in that area.

Like with the term "specialty," the Legislature did not define the phrase "board certified" in MCL 600.2169.  Because of this, the plaintiffs in both these cases have argued that we should read MCL 600.2169 *in pari materia* with MCL 333.2701(a) of the Public Health Code, which defines "board certified" as "certified to practice in a particular medical specialty by a national board

---

[40] An example of a case where a plaintiff's proposed expert did not match the defendant doctor's qualifications at both levels can be seen in our recent decision in *Halloran v Bhan,* 470 Mich 572; 683 NW2d 129 (2004).  In *Halloran*, we held that the plaintiff's proposed expert failed to meet the requirements of MCL 600.2169 because, although he arguably matched the defendant doctor's credentials at the subspecialty level, he failed to match them at the broader specialty level. *Id.*

recognized by the American board of medical specialties [ABMS] or the American osteopathic association [AOA]." Accordingly, plaintiffs urge this Court to hold that a proposed expert need only match a defendant doctor's board certification if that certification was issued by the ABMS or the AOA.

We decline to impute the definition of "board certified" from MCL 333.2701(a) to MCL 600.2169 for several reasons. First, the Legislature made clear that the definition of "board certified" set forth in MCL 333.2701(a) applies only to the Public Health Code by prefacing it with the statement "*As used in this part* [of the Public Health Code] . . . 'Board certified' means . . . ." (Emphasis added.) Especially in light of such clear words of limitation, we must presume that the Legislature intended that the definition of "board certified" set forth in MCL 333.2701(a) would not be applied to other statutes using the same phrase.[41] Second, statutes are only read *in pari materia* when they relate to the same subject or share a common purpose,[42] and not when, as here, their scope and aim are

[41] See *Grimes v Dep't of Transportation,* 475 Mich 72, 85; 715 NW2d 275 (2006); see also *Farrington v Total Petroleum, Inc,* 442 Mich 201, 210; 501 NW2d 76 (1993) ("Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there."); *Detroit v Redford Twp,* 253 Mich 453, 456; 235 NW 217 (1931) ("Courts cannot attach provisions not found therein to an act of the legislature because they have been incorporated in other similar acts."), citing *Michigan v Sparrow,* 89 Mich 263, 269; 50 NW 1088 (1891).

[42] *Detroit v Michigan Bell Tel Co,* 374 Mich 543, 558; 132 NW2d 660 (1965).

distinct and unconnected.[43]    The Legislature's purpose in enacting the Public

Health Code was to protect the public health, safety, and welfare,[44] by regulating

the persons, facilities, and agencies that affect them.  Its purpose in enacting the

Revised Judicature Act, of which MCL 600.2169 is a part, was to set forth the

organization and jurisdiction of the judiciary and to effect procedural

improvements in civil and criminal actions.[45]  MCL 600.2169 fulfills this purpose

by setting minimum requirements for proposed experts to ensure that proof of

medical malpractice "'emanate[s] from sources of reliable character,'"[46] and is

unrelated to protecting the health, safety, and welfare of the general public.

We thus fall back on the general rule set forth in MCL 8.3a that undefined,

technical phrases are to be construed and understood according to their peculiar

and appropriate meaning.  We also keep in mind that if the Legislature had wanted

to limit the definition of "board certified" in MCL 600.2169 only to certification

by specific organizations it would have done so explicitly, as it did in MCL

---

[43] *Beznos v Dep't of Treasury (On Remand),* 224 Mich App 717, 722; 569 NW2d 908 (1997).

[44] MCL 333.1111(2).

[45] See *Connelly v Paul Ruddy's Equip Repair & Service Co,* 388 Mich 146, 151; 200 NW2d 70 (1972) ("The purpose of the Act was to effect procedural improvements, not advance social, industrial or commercial policy in substantive areas.").

[46] *McDougall, surpa* 461 Mich at 36, quoting *McDougall, supra*, 218 Mich App at 518 (Taylor, P.J., dissenting).

333.2701(a).[47]  Doing so, we adopt the definition of "board certified" set forth by the Appellate Division of the Supreme Court of New York,[48] which has defined that term as denoting "a credential bestowed by a national, independent medical board indicating proficiency in a medical specialty."[49]

As we did above with regard to the "specialty" versus "subspecialty" dispute, it is again necessary for us to resolve a question that arises in most cases as a result of nomenclature often used to distinguish between certifications offered

---

[47] A further indication that the Legislature intended to limit the phrase "board certified" to certification by either the ABMS or the AOA *only* for the purposes of the Public Health Code is that it did not limit the phrase in either of the other two instances it has defined it.  Specifically, in both MCL 500.2212a(4) of the Insurance Code and MCL 550.1402a(4) of the Nonprofit Health Care Corporation Reform Act, the Legislature defined "board certified" as certification by the ABMS or another "national health professional organization."

[48] The state of New York calls its equivalent to Michigan's circuit court (i.e., the trial court of general jurisdiction) the Supreme Court.  The Appellate Division of the Supreme Court of New York is the equivalent of the Michigan Court of Appeals.

[49] *Rosenblum v New York State Workers' Compensation Bd,* 309 AD2d 120, 123; 764 NYS2d 82 (2003).  This definition is consistent with how medical dictionaries define the phrase.  See *Taber's Cyclopedic Medical Dictionary* (18th ed), defining "board certification," in part, as "a process that ensures that an individual has met standards beyond those of admission to licensure and has passed specialty examinations in the field."

The justices in the lead opinion state that they find it "befuddling" that we have adopted the definition of "board certified" from *Rosenblum* without further explanation.  However, we have explained, we believe, that we adopted the definition from *Rosenblum* because it is consistent with the technical, medical definition of the term as required by MCL 8.3a and, simultaneously, is consistent with our Legislature's intention that the phrase "board certified" not be limited only to credentials bestowed by certain national organizations.

for broad specialty areas and certifications offered for the narrower subspecialty areas. Specifically, certifications coinciding with the broader specialty areas are often referred to by parties and in case law as board certifications, while certifications coinciding with the narrower specialty areas are referred to as "certificates of special qualifications" or "certificates of added qualifications." The result is that in many cases, such as *Woodard*, plaintiffs will argue that certificates of special qualifications are not board certifications that need to be matched. We clarify, however, that under the above definition of the phrase "board certified," any difference between what are traditionally referred to as board certifications and what have commonly been called certificates of special qualifications is merely one of semantics. When a certificate of special qualifications is a credential bestowed by a national, independent medical board indicating proficiency in a medical specialty, it is itself a board certification that must be matched.

## C. WHETHER ALL SPECIALTIES AND BOARD CERTIFICATIONS MUST BE MATCHED

Because many defendant doctors specialize in more than one area, or have become board-certified specialists in more than one area, the question often arises whether MCL 600.2169 requires that a proposed plaintiff's expert match *all* the defendant doctor's specialties and board certifications. In *Tate v Detroit Receiving*

*Hosp*,[50] our Court of Appeals answered this question in the negative. Relying primarily on the statute's mandate that a proposed expert must "'specialize[] *at the time of the occurrence that is the basis of the action*'" in the same specialty as the defendant doctor,[51] the *Tate* panel concluded that MCL 600.2169 "should be read so as to allow an expert to testify if that expert [specializes in or] is [a] board certified [specialist] in the same specialty being practiced by the [defendant] health professional *at the time* of the alleged malpractice."[52] While we generally agree with the result reached by the Court of Appeals in *Tate*, we disavow its rationale.

The primary flaw with the Court of Appeals holding in *Tate* is that it bases its conclusion regarding what expert testimony is required on the language of MCL 600.2169. By its plain terms, however, MCL 600.2169 *never* requires a plaintiff to introduce expert testimony with regard to the standard of care. Instead, it merely states that if a plaintiff needs to introduce expert testimony to establish the appropriate standard of care, the expert introduced must meet the requirements set forth in the statute. Thus, the issue whether a plaintiff needs to introduce expert testimony at all, and, if so, whether the plaintiff needs to introduce expert testimony concerning the standard of care applicable to all the defendant doctor's

---

[50] 249 Mich App 212; 642 NW2d 346 (2002).

[51] *Id.* at 218, quoting MCL 600.2169(1)(a)(emphasis added).

[52] *Id.* at 215 (emphasis in *Tate*).

specialties and board certifications, depends not on MCL 600.2169, but on the specialties and board certifications that are put into issue by the parties during the pleading and discovery process.  To illustrate this point, we provide the following hypothetical examples:

1.  Assume a plaintiff sues a doctor who has five specialties, but asserts in the complaint and accompanying affidavit of merit that the defendant doctor should have met the standard of care coinciding with only one of the defendant doctor's specialties, and that the defendant doctor's other four specialties are irrelevant to establishing and understanding that standard of care.  Further assume that, in the answer, the defendant doctor admits that the plaintiff has asserted the appropriate standard of care, further admits that the challenged actions did not conform to it, and only contests the amount of damages.[53]  In this situation, the plaintiff need not present expert testimony regarding the standard of care at trial. The plaintiff need only offer evidence regarding damages.  MCL 600.2169 is thus inapplicable.  The result would be the same in a case where a plaintiff is able to successfully avail himself or herself of the doctrine of res ipsa loquitur.

2.  Assume again that the plaintiff sues a doctor who has five specialties, and again asserts in the complaint and accompanying affidavit that the defendant

---

[53] Although we refer only to the defendant doctor's answer and affidavit of meritorious defense in these hypothetical examples, the parties can, of course, further refine which specialties and board certifications are at issue through subsequent discovery techniques such as depositions, requests for admissions, written interrogatories, and so forth.

doctor should have met the standard of care coinciding with only one of the defendant doctor's specialties, and that the defendant doctor's other four specialties are irrelevant to establishing and understanding that standard of care. This time, the defendant doctor admits in the answer and accompanying affidavit that the plaintiff has asserted the correct standard of care, but asserts that the challenged actions conformed to it. In this case, MCL 600.2169 applies because the plaintiff will need to introduce "expert testimony on the appropriate standard of practice or care" in order to prove that the defendant doctor's actions did not conform to it. However, because the defendant doctor has conceded that only one of the five specialties is germane to the appropriate standard of care, the plaintiff's proposed expert only has to comply with the mandates of MCL 600.2169 with regard to that one specialty.

3. Assume again that the plaintiff sues a doctor who has five specialties, and again asserts in the complaint and accompanying affidavit that the defendant doctor should have met the standard of care coinciding with only one of the defendant doctor's specialties, and that the defendant doctor's other four specialties are irrelevant to establishing and understanding that standard of care. Assume this time that the defendant doctor, instead of admitting that the plaintiff has asserted the appropriate standard of care, asserts that the standard of care coinciding with one of the other specialties is the one the defendant should have met. In this situation, unless the plaintiff agrees with the defendant, the plaintiff will need to present expert testimony concerning the standards of care applicable

to two of the defendant doctor's five specialties—the one that the plaintiff asserts is applicable and the one that the defendant asserts is applicable. No testimony regarding the standard of care for the defendant doctor's other three specialties will be needed because the defendant has conceded that they do not apply.

In this third hypothetical, the plaintiff will need to present two types of expert testimony: testimony to prove that the standard of care asserted by the defendant doctor *does not* apply, and testimony to establish the standard of care the plaintiff believes is applicable and how the defendant breached it. This, of course, raises the question whether MCL 600.2169 requires the plaintiff to produce one expert qualified to offer testimony in both areas. We hold that it does not; rather, it allows a plaintiff to produce multiple experts, each matching the defendant doctor's credentials with regard to one specialty area, in order to fulfill the burden.[54] The reason is that MCL 600.2169(1)(b) requires a plaintiff's proposed expert to have devoted a majority of his or her professional time during the year immediately preceding the alleged malpractice to either the active clinical practice of, or the teaching of, the specialty about which the expert will testify. The statute does not impose a similar burden on the defendant doctor. Thus, while a defendant doctor can offer testimony regarding the appropriate standard of care

_____

[54] We further note that this holding necessarily applies also to MCL 600.2912d(1). Thus, a plaintiff can, and in many cases will need to, utilize multiple experts at the affidavit of merit stage who the plaintiff reasonably believes collectively match all the defendant doctor's specialties.

for more than one specialty area, it would be impossible under the statute for a plaintiff to present one expert to likewise testify regarding the appropriate standard of care for more than one specialty area. It is a fundamental rule of statutory interpretation that statutes should be given a reasonable construction based on the legislative intent that can be inferred from their words.[55] A construction of MCL 600.2169 that would render compliance impossible would not be reasonable.[56]

## D. RESPONSE TO THE JUSTICE MARKMAN LEAD OPINION SIGNED BY JUSTICES CAVANAGH, KELLY, AND WEAVER, WHICH WE CONSIDER A DISSENT

The lead opinion's interpretation of MCL 600.2169(1), as we understand it, is that it represents a legislative determination that in all cases *only one* of the defendant doctor's specialties will be relevant to establishing the standard of care he or she should have met. Therefore, the justices in the lead opinion assert that

---

[55] *Rakestraw v Gen Dynamics Land Systems, Inc,* 469 Mich 220, 224; 666 NW2d 199 (2003) ("In interpreting a statute, our obligation is to discern the legislative intent that may reasonably be inferred from the words actually used in the statute."); see also *Massey v Mandell,* 462 Mich 375, 379-380; 614 NW2d 70 (2000).

[56] *West v Northern Tree Co*, 365 Mich 402, 406; 112 NW2d 423 (1961) ("The law should not be read to require the impossible."). The rule that a statute should not be construed as requiring the impossible is commonly referred to as the doctrine of *lex non intendit aliquid impossible,* which means that "[t]he law does not intend anything impossible. For otherwise the law should not be of any effect." Black's Law Dictionary (6th ed). It is based on the presumption that the Legislature intended for the laws it enacts to be effective, rather than rendered ineffective by a construction requiring a condition that is physically impossible to perform. *Chew Heong v United States*, 112 US 536, 554-555; 5 S Ct 255; 28 L Ed 770 (1884).

the statute directs the trial court to determine, at the beginning stages of a lawsuit, exactly which specialty area the defendant doctor was practicing at the time of the alleged malpractice and to limit the expert testimony that may be presented to the jury only to testimony regarding the standard of care commensurate with that specialty area, or what the lead opinion terms the "relevant" specialty. However, the lead opinion's interpretation is not grounded in the statutory language. Furthermore, its effect is to allow the trial court in the name of culling out the irrelevant to really exercise a power of theory preclusion with regard to both plaintiffs and defendants heretofore unknown in our jurisprudence. In doing so, it will deny in given cases either a plaintiff or a defendant doctor his or her constitutional right to have a jury determine factual matters, weigh evidence, and assess credibility. This result will collide with the due process right under our Constitution of a party to present the theories it has as long as there is sufficient evidence to support each theory.

The biggest problem with the lead opinion's interpretation of the statute is that it misunderstands completely the traditional roles played by the judge and jury in the trial process. Juries find facts so as to evaluate the theories of the parties. Judges, among other things, keep out evidence that is irrelevant to the proving of the theories. If the parties cannot produce evidence sufficient for a reasonable juror to decide the case on the basis of a certain theory, the jury is precluded by the judge from considering that theory. This preclusion however cannot come before proofs are presented or it is shown that there are no such facts by a properly

pleaded motion for summary disposition or similar motion. A simple example to demonstrate this, albeit from another context, may be helpful. Let us assume that sometime after construction is completed a building collapses. In such a case, if the owner sues the architect on the theory of malpractice, the architect could defend by saying he or she was not the cause because he or she was not negligent but that the real cause was perhaps the negligence of the construction engineers, defectively manufactured materials, or even that there was an act of God, say, an earthquake. These alternative explanations, or theories, of how the building collapsed of course would either be factually supportable or not. If there was evidence to support them, they would be submitted to the jury for sorting out. This opportunity to support a party's theory with evidence cannot be precluded at the initiation stage of the lawsuit. It only can be done by a motion asserting that there is no genuine issue of material fact pursuant to MCR 2.116(C)(10), or a similar type of pretrial motion, or at the close of a party's proofs at trial where insufficient facts have been submitted. In no case, however, could the theories be described, as the lead opinion does, as relevant or irrelevant. The theories only give alternative views regarding how things happened. The words, relevant or irrelevant, can only apply to the supporting evidence for the theories. In any case, to complete the example, under the lead opinion's thinking, in our hypothetical case a court could hold that the earthquake theory is irrelevant and preclude testimony on it immediately after the answer was filed and before there was any opportunity to even secure or present supporting facts.

34

The problem the hypothetical points out is the problem the lead opinion will create in medical malpractice cases also. For instance, if a doctor who specializes in cardiovascular surgery and nephrology[57] negligently inserts a pacemaker, the trial court should not be able to preclude either the plaintiff or the defendant from arguing that the defendant's specialty in nephrology was or was not implicated by the procedure as long as the parties can produce reliable[58] expert testimony to support their theories. If they do, they should be allowed to present

---

[57] Nephrology is a medical specialty involving the kidneys. *Merriam Webster's Medline Plus,* <http://www2.merriam-webster.com/cgi-bin/mwmednlm?book= Medical&va=nephrology> (accessed April 20, 2006).

[58] As we outlined at the beginning of the analysis section, the requirements set fort in MCL 600.2169(1) are only *minimum* requirements. The reliability requirements of MCL 600.2955 and MRE 702 must also be considered. Thus, in order to present expert testimony that a particular specialty area is germane to establishing the appropriate standard of care, a party not only needs to establish that its proposed expert meets the credential and experience requirements of MCL 600.2169(1), but *also* that the expert's opinion is based on proven theories and methodologies, i.e., that it is not based on "junk science." *Gilbert v DaimlerChrysler Corp,* 470 Mich 749, 779-783; 685 NW2d 391 (2004); see also MCL 600.2955; *Craig v Oakwood Hosp,* 471 Mich 67, 78-80; 684 NW2d 296 (2004). The lead opinion appears to overlook this fact and, thus, seems to think that under our analysis parties, particularly defendants, will be able to assert that any specialty is germane to establishing the standard of care.

The lead opinion responds to this by asserting that we are "confusing relevancy and reliability." *Ante* at 18 n 14. That is not the case. What we are stating is that a party must present reliable expert testimony to prove that a specialty area is germane to establishing the standard of care. The lead opinion dismisses this by asking why a party should have to introduce evidence concerning an irrelevant specialty. We would ask in response how exactly it is that a specialty area can be dismissed as irrelevant when reliable expert testimony has been presented that it was implicated by the procedure performed and, thus, is germane to understanding the standard of care the defendant doctor should have exercised.

their theories to the jury for it to make the factual determination of which specialty or specialties were implicated by the procedure. Yet, under the lead opinion's approach, if the trial judge determines after the defendant's answer is filed that one party's theory regarding which specialty explains the standard of care is "irrelevant," no proofs are allowed on it. Never, before today, has a theory in this or any other litigation of which we are aware been itself declared unpresentable without regard to the evidence to support it. What the lead opinion is doing is not a relevancy exercise. The only "relevancy" question for the trial court would be whether the proffered testimony has any tendency to make it more or less probable that the procedure the defendant doctor performed implicated one or more of his or her specialty areas. But this is not the decision the lead opinion wants the trial court to make. The lead opinion wants to let the trial court determine the factual question whether the procedure performed by the defendant doctor did, in fact, implicate one or more of the doctor's specialty areas. This *is not* a relevance question, no matter how adamant the lead opinion is in trying to characterize it as one. Rather, it is an exercise of explanatory theory preclusion.

By allowing such theory preclusion, the lead opinion's analysis allows in a medical malpractice case the trial court, rather than the jury, to determine the factual issue of which specialty or specialties the defendant doctor was practicing at the time of the alleged malpractice. *Ante* at 8-9. This plainly disrupts the historical dynamic of our trial process, whereby factual determinations are to be made by the jury.

The historical division of functions between the court and the jury needs no citation of authority. It is the province of the jury to determine questions of fact and assess the credibility of witnesses.[59]

Not only will the lead opinion's analysis take factual determinations out of the province of the jury, it will also foreclose the jury from assessing credibility and weighing evidence. A good example on the credibility issue can be seen in *Woodard*. Defendant Custer has argued throughout the proceedings in this case that the procedures he performed implicate the specialty of pediatric critical care. It is the case, however, that plaintiff's proffered expert, Anthony Casamassima, M.D., who specializes in general pediatrics, testified in his deposition that he performed the same procedures on infants the same age as Austin Woodard during his residency.[60] On the basis of this testimony, plaintiffs have asserted that

---

[59] *People v Lemmon*, 456 Mich 625, 636-637; 576 NW2d 129 (1998); see also *Page v Stanley,* 242 Mich 326, 330; 218 NW 673 (1928). That factual determinations are solely within the province of the jury is not only a matter of historical happenstance, it is also guaranteed by the Michigan Constitution. Specifically, Const 1963, art 1, § 14 provides that, when demanded, the defendant has a right to a jury trial. As we recently explained in *Phillips v Mirac, Inc,* 470 Mich 415, 426; 685 NW2d 174 (2004), this includes the right to have questions of fact decided by the jury.

[60] The following colloquy took place during Dr. Casamassima's deposition:

*Q.* When is the last time you inserted a central venous line in a patient as old as Austin Woodard?

*A.* During my residency.

*Q.* Same question with regard to the arterial line.

(continued…)

37

although such procedures were performed by a critical care specialist in this case, they do not necessarily implicate the specialty of critical care medicine. Under our analysis of the statute, if plaintiffs had presented their own critical care specialist meeting the criteria of MCL 600.2169(1) to support proffered expert Casamassima's testimony that these procedures do not implicate the specialty of critical care, the testimony from all three doctors (Woodard, Casamassima, and plaintiff's critical care specialist) would be presented to the jury. The jury, after hearing this testimony, would evaluate the credibility of each doctor, determine how much weight should be given each doctor's testimony, and make a factual determination regarding the theories so as to determine whether the procedures performed by defendant Custer do, in fact, implicate the specialty of pediatric critical care and the standard of care commensurate with it or, rather, merely implicate the specialty of general pediatrics and its commensurate standard of care. This is the jury's traditional function.[61] The lead opinion, however, does not even mention proffered expert Casamassima's testimony. Instead, it concludes without discussing it that Custer was "practicing pediatric critical care

_____

(…continued)

       *A.* During my residency.

    [61] *Lemmon, supra*; see also *Alley v Klotz,* 320 Mich 521, 532; 31 NW2d 816 (1948).

38

medicine . . . ." *Ante* at 26.[62]  How do they know?  To say it was one or the other specialty is not a determination concerning relevance but a choice of which it was after considering evidence.[63]

Even more troubling at a less theoretical plane than the theory-preclusion role that the lead opinion gives to the trial court is how this will be practically implemented.  There are puzzling questions to which the lead opinion provides no answers.  For example, consider the following difficulties.  In the case where there

_____

[62] The lead opinion attempts to support its conclusion that these procedures implicate the specialty of critical care medicine by stating that Custer performed them in the PICU while the infant patient was critically ill.  The fact that a particular procedure is performed in a PICU on a critically ill patient, however, does not necessarily mean that *that* particular procedure implicates the specialty of critical care medicine.  As an example, the mere fact that a critical care specialist practicing in a PICU inserts an IV into the arm of a critically ill patient does not in and of itself make the insertion of IVs a procedure implicating the doctor's specialty in critical care medicine.

[63] The lead opinion claims that it knows Custer was practicing pediatric critical care medicine "because all of the admissible evidence supports the trial court's finding that the defendant physician was practicing pediatric critical care medicine at the time of the alleged malpractice."  *Ante* at 26 n 19.   That is not the case because Cassamassima's testimony was admissible to prove that he, a specialist in general pediatric care, performed such procedures during his residency.  From this testimony, and the context in which it was elicited, the jury could reasonably infer that it is relatively common for doctors who practice only general pediatric care to perform the procedures in this case and that a specialty in pediatric critical care is not required to understand the standard of care that should have been followed.  The lead opinion, however, simply concludes without considering this testimony that these procedures require a specialty in pediatric critical care to perform and then, on the basis of that conclusion, asserts that Cassamassima's testimony is not admissible because it was not offered by a specialist in pediatric critical care.

are multiple specialties claimed, the trial court would have to have a hearing very soon after the defendant's answer is filed so that the parties can get the decision by the judge of what the "relevant" specialty is so they can secure experts. Yet, at that point, there will be no depositions and probably not even reports, at least for the defendant doctor who just got sued. How is the trial judge to determine which specialties are "relevant" without expert testimony gained from depositions?[64] Moreover, reports, if there are any, are hearsay. How is that dealt with? Further, once the decision is made by the trial court, how does the loser proceed if that party, plaintiff or defendant or maybe even both, thinks the trial court got it wrong? Does he or she make an application for interlocutory leave to appeal in the Court of Appeals? Even if the Court of Appeals does grant the interlocutory

---

[64] The justices in the lead opinion seem to believe that the trial court will simply be able to determine at the beginning stages of trial, without expert testimony, whether a particular procedure implicates a particular specialty. We find this curious given this Court's historical recognition that expert testimony is almost always needed to establish the standard of care in medical malpractice actions because it is something that is not within the common purview of jurors or the court. *Woodard I, supra,* 473 Mich at 6; *Bryant v Oakpointe Villa Nursing Centre, Inc,* 471 Mich 411, 422-423; 684 NW2d 864 (2004). The justices in the lead opinion respond by asserting that expert testimony probably will not be required in most cases. However, contrary to the lead opinion's belief, most cases probably will not be as simple as choosing between cardiovascular surgery and podiatry because most defendant doctors' specialties will be closely related. The lead opinion also accuses us of "ignoring the distinction between determining which specialty is relevant and determining the appropriate standard of care," *ante* at 19 n 15, and asserts that expert testimony will only be needed to determine the standard of care, not the specialty or specialty areas implicated by a procedure. How, exactly, will a trial judge with no medical training determine whether a particular procedure implicates such interrelated specialties as pediatric critical care medicine or neonatal-perinatal care medicine, or both.

leave to appeal, if the trial court's decision is affirmed and this Court will not

review the case (which is very likely), does the loser then get to create a separate

record in the trial court regarding his or her theory—the theory that the jury never

heard?[65]  If he or she is allowed a separate record (and how could he or she not

be?), surely the opposing party will defend even on that separate record with their

own experts.  Where is the economy in this approach, which approach was, as

advanced by the lead opinion, to stop the needless expense of having to secure

"irrelevant" experts?  Further, when the jury has heard only one theory regarding

the standard of care and specialty at issue and an appeal of its decision is taken, is

the earlier interlocutory holding (if there was one) res judicata?  If it is not

binding, or if there was no interlocutory appeal granted, how is the Court of

Appeals, or eventually this Court, to analyze the factual dispute, at that stage or for

that matter interlocutorily, with regard to the vying theories of "relevant"

specialties" and, thus, differing standards of care?  Appellate courts will have no

basis for a decision on that factual issue or issues.  These condundrums all come

---

[65] Strangely, the lead opinion asserts that a separate record will not be necessary because all the defendant doctor will have to do to preserve the issue is object on the ground that the plaintiff's expert does not specialize in the "relevant" specialty. *Ante* at 25.  The lead opinion misses the point.  The issue on appeal will not be whether the proposed expert specializes in the specialty area the trial court determined was the "relevant" one.  Rather, the issue will be whether the trial court chose the correct specialty as the "relevant" one.  There will be no way for an appellate court to assess that determination without a record being made containing expert testimony regarding which specialty areas were implicated by the procedure the defendant doctor performed, just as there is no way for a trial court to make the determination in the first instance without such a record.

from the fact that the justices in the lead opinion misunderstand what they are calling on judges to do.

At another level, constitutional rather than merely practical, the lead opinion's theory-preclusion approach denies a defendant doctor the right to procedural due process. This, of course, violates the United States Constitution and Michigan Constitution, which provide that no person (such as one being sued) shall be deprived of "life, liberty, or property, without due process of law."[66] Said simply, this means that the Court must allow the defendant doctor an effective opportunity to defend the action, which entitles the defendant to confront adverse witnesses, to call his or her own witnesses, and to present evidence and arguments.[67]

But the lead opinion's theory-preclusion analysis prevents a defendant doctor from arguing, and introducing evidence to prove, that more than one of his or her specialty areas is germane to establishing the appropriate standard of care. It also precludes the doctor from arguing that the plaintiff's proposed expert does not know what standard of care the defendant doctor should have followed because the proposed expert does not possess the same specialties and has not spent the requisite time practicing or teaching those specialties. Thus, the lead opinion's interpretation of the statute allows the trial court to prevent the

---

[66] US Const, Am XIV, §1; Const 1963, art 1, § 17.

[67] *Bundo v Walled Lake*, 395 Mich 679, 696; 238 NW2d 154 (1976).

defendant from introducing evidence, making arguments, and cross-examining witnesses, i.e., presenting a defense.

Further, the lead opinion's theory-preclusion analysis will also adversely affect plaintiffs. That is, the justices in the lead opinion appear to believe that it will always be defendants who assert that multiple specialties are germane to establishing the appropriate standard of care, perhaps as some sort of gaming tactic. See *Ante* at 18. We, however, do not believe that this will always be the case. For example, if a defendant doctor is a specialist in two areas, a plaintiff may wish to argue that the combination of the defendant's specialization in both areas imposes a higher standard of care on the defendant than the standards of care applicable to the individual areas. Under our interpretation of the statute, the plaintiff is allowed to argue to the jury that the higher standard of care applies, as long as he or she can produce experts who satisfy the criteria of MCL 600.2169(1) for both areas. Under the lead opinion's interpretation of the statute, however, the plaintiff cannot present such an argument to the jury. Rather, the trial court would determine that only the standard of care applicable to one of the specialty areas is the "relevant" one, thereby precluding the plaintiff from arguing to the jury that the higher standard of care applies. Thus, the lead opinion's interpretation of the statute will not only deny defendants the right to present a complete defense, but will also limit the theories that plaintiffs can present to the jury. Do the justices in the lead opinion believe that this is without possible constitutional implications?

All of these problems with the lead opinion's analysis stem from the fact that the justices in the lead opinion repeat the same error made by the Court of Appeals in *Tate.* That is, they rely on MCL 600.2169(1) to answer the question of what expert testimony is needed. However, as we explained above, the statute was never intended to, and indeed does not, address that issue. Nowhere in MCL 600.2169(1) did the Legislature attempt to address *whether* a plaintiff needs to produce expert testimony with regard to a particular standard of care. Rather, as we explained in *McDougall,* the Legislature's purpose in enacting MCL 600.2169 was to ensure that *if* a plaintiff needs to produce expert testimony regarding a particular standard of care, that expert testimony "'emanate[s] from sources of reliable character . . . .'"[68]

In misinterpreting MCL 600.2169(1) as resolving the question *whether* expert testimony is needed with regard to a particular standard of care, the lead opinion first notes that the statute states that a proffered expert shall not testify regarding "the *appropriate* standard of practice or care" unless he or she satisfies the listed criteria. The lead opinion incorrectly construes this as a legislative determination that the plaintiff only has to produce expert testimony establishing the standard of care coinciding with what the lead opinion terms "the relevant" specialty area, i.e., the standard of care applicable to the specialty area that the

---

[68] *McDougall, supra* (Taylor, P.J., dissenting) 461 Mich at 36, quoting *McDougall*, 218 Mich App at 518.

44

defendant doctor was practicing at the time of the malpractice. We believe the lead opinion's construction is erroneous because expert testimony regarding "the *appropriate* standard of practice or care" *necessarily includes* testimony about whether a particular procedure implicates a certain specialty area and, therefore, the standard of care applicable to that specialty area.[69] In other words, what the statute clearly says is that a proffered expert cannot testify with regard to what specialty area the defendant doctor was practicing and the standard of care commensurate with that specialty unless the proposed expert meets the requirements of MCL 600.2169(1).

We also disagree with the lead opinion's reliance on the use of terms such as "the same specialty," "that specialty," "a person," and "the person" in MCL 600.2169(1)(a) for the proposition that a plaintiff need only present expert testimony regarding the standard of care applicable to one of the defendant doctor's specialty areas. We agree with the lead opinion that these phrases are written in the singular. But our construction of the statute does not, as the lead opinion believes, require reading them in the plural. Said simply, the fact that the

_____

[69] The word "appropriate," which can be defined by reference to an ordinary dictionary because it is a common, rather than technical, term, means "[s]uitable for a particular person, condition, occasion, or place; proper; fitting." *The American Heritage Dictionary: Second College Edition* (1982). We would also note that even if the statute used the term "relevant," as the lead opinion does, it still would encompass testimony regarding whether a particular procedure implicates a certain specialty area and, therefore, the standard of care applicable to that specialty area. This is because the word "relevant" means "[r]elated to the matter at hand; pertinent." *Id.*

45

plaintiff may need to produce multiple experts concerning the applicability or nonapplicability of multiple standards of care does not change the fact that each proffered expert is "a person" who must match the defendant doctor's qualifications with respect to "that specialty" that he or she is called to testify about.[70]

The sum of all of this is that the lead opinion's interpretation of MCL 600.2169(1) does not follow from its plain language. It also allows the trial court to perform functions that are solely within the province of the jury, such as making credibility and factual determinations. Moreover, it effectively denies a defendant doctor his or her due process right to present a defense, and precludes plaintiffs from presenting supportable theories. We do not believe that such an interpretation of the statute is a reasonable one and we believe that it likely is an unconstitutional approach. Therefore, we cannot join it.

### E. ANALYSIS OF THE EFFECT OF JUSTICE MARKMAN'S HAVING SIGNED BOTH THE LEAD OPINION AND HIS CONCURRENCE

We find Justice Markman's interpretation of the statute perplexing. He purports to concur in the lead opinion's conclusion that MCL 600.2169(1) requires the trial court to choose one, and only one, specialty that is germane to establishing the appropriate standard of care and to preclude the parties from

---

[70] Contrary to Justice Markman's assertion in his concurrence, this explains why our decision here is *not* inconsistent with this Court's holdings in *Robinson v Detroit,* 462 Mich 439, 462; 613 NW2d 307 (2000), or *Paige v City of Sterling Hts,* __ Mich __; ___ NW2d ___ (Docket No. 127912, decided July 31, 2006).

46

introducing expert testimony regarding other specialties claimed to be relevant. Inconsistently, he then argues in his concurrence that under MCL 600.2169(2) and (3) and MRE 702 the trial court may determine that *more than one* specialty is relevant and allow the parties to introduce expert testimony with regard those other relevant specialties.[71] These positions are incompatible. Simply stated, the concurrence does not concur but disagrees. It should be a dissent. Because the concurrence, which must have been written after the lead opinion and thus is later in time, has been joined in part by the three justices signing this opinion, we believe it now becomes a de facto majority opinion.[72]

---

[71] Furthermore, the lead opinion concludes that because there can only be one relevant specialty, plaintiffs are only required to produce one expert. But, Justice Markman agrees with both the lead opinion and this opinion that the practice and teaching requirements in MCL 600.2169(1)(b) preclude any proffered expert from being able to testify about more than one specialty area. Thus, because he states in his concurrence that plaintiffs can be obligated to produce expert testimony regarding more than one specialty area, it logically follows that plaintiffs must be able to utilize more than one expert, just as we have concluded in this opinion. Justice Markman does not concede this in his concurrence, but it is a necessary conclusion in order for his analysis to work.

[72] In his response to this opinion, Justice Markman adamantly asserts that his concurrence is consistent with the lead opinion. In doing so, he states, "While the majority opinion holds that under § 2169(1) only the one most relevant specialty must match, this does not mean that a different provision of law cannot require that other relevant specialties be matched." *Ante* at 6. Justice Markman apparently does not see the inconsistency in arguing that there can only be one relevant specialty and, at the same time, arguing that there can be more than one. He also apparently does not realize that his argument that "different provision[s] of law" require more than one specialty to match defeats the lead opinion's argument that MCL 600.2169(1) mandates that there can be only one "relevant" specialty and, in the process, renders nugatory every word and clause of MCL 600.2169(1) that the lead opinion relies on for the conclusion that there can be

(continued…)

IV. APPLICATION

A. *WOODARD v CUSTER*

It is undisputed that defendant Custer holds himself out as limiting his practice primarily to, and having advanced training in, the fields of pediatric critical care and neonatal-perinatal medicine. He therefore qualifies as a specialist in both of those areas.[73] Further, under the definition we have set forth above, Custer qualifies as a board-certified specialist in both of these areas. Plaintiffs' proposed expert, however, only qualifies as a board-certified expert in general pediatric care.

Throughout the proceedings in this case, Custer asserted that the specialty areas of pediatric critical care and neonatal-perinatal medicine were germane to establishing and understanding the standard of care that he should have followed when treating plaintiffs' son in the Pediatric Intensive Care Unit. Plaintiffs, however, failed to present experts qualified to testify that the specialties of pediatric critical care and neonatal-perinatal medicine were not relevant to

(…continued)
only one "relevant" specialty. Furthermore, Justice Markman fails to explain how it is reasonable to interpret MCL 600.2169(1) as mandating that there be only one relevant specialty but, simultaneously, saying that experts proffered to testify about other specialty areas must meet the requirements of MCL 600.2169(1). Justice Markman states that our opinion "sows confusion," *Ante* at 3 n 1; *Ante* at 9, but we believe that it is *his* position that sows confusion.

[73] Although defendant Custer is board-certified in general pediatrics, he only holds himself out as a specialist in pediatric critical care and neonatal-perinatal medicine as the director of pediatric critical care medicine for the PICU. He therefore does not qualify as a specialist in general pediatrics.

establishing and understanding the standard of care that Custer should have met. Rather, their proposed expert was only qualified to testify regarding the standard of care coinciding with the specialty area they asserted was relevant, general pediatrics. Accordingly, because plaintiffs needed three expert witnesses and only presented one, they failed to present sufficient expert testimony to establish the appropriate standard of care. The trial court thus properly dismissed their lawsuit.

## B. *HAMILTON v KULIGOWSKI*

Defendant Kuligowski holds himself out as limiting his practice primarily to, and having advanced training in, general internal medicine. He therefore qualifies as a specialist in that field.[74] Further, because it is undisputed that he has obtained board certification in general internal medicine, he qualifies as a board-certified specialist in that field.

Although he does not hold himself out as limiting his practice primarily to that field, plaintiff's proposed expert holds himself out as having advanced training or knowledge in general internal medicine. Further, he is board-certified in that field and therefore qualifies as a board-certified specialist in general internal medicine. Thus, were he only required to meet the requirements of MCL 600.2169(1)(a), plaintiff's proposed expert would be qualified to testify regarding

---

[74] Although he testified that he mainly sees geriatric patients, Kuligowski does not hold himself out as limiting his practice to, or having advanced knowledge in, the treatment of geriatric patients and, therefore, does not also qualify as a specialist in geriatric internal medicine.

the appropriate standard of care that Kuligowski should have met because plaintiff's proposed expert was a board-certified specialist in the same specialty as Kuligowski at the time of the alleged malpractice.

Plaintiff's difficulties, however, stem from the fact that her proposed expert also qualifies as a specialist in the field of infectious diseases, and admittedly spent a majority of his professional time during the year preceding the alleged malpractice in the active clinical practice of infectious diseases rather than general internal medicine. Thus, plaintiff's proposed expert fails to meet the requirements of MCL 600.2169(1)(b). Accordingly, the trial court properly granted Kuligowski's motion to strike plaintiff's proposed expert. Further, because the result was that plaintiff failed to present needed qualified expert testimony to support her lawsuit, the trial court correctly granted Kuligowski's motion for a directed verdict.

## V. CONCLUSION

The trial courts in both these cases properly held that plaintiffs' proposed experts were not qualified under MCL 600.2169 to testify regarding the appropriate standard of care that the defendant doctors should have met.

In *Woodard*, a majority of the Court of Appeals properly affirmed the trial court's determination that plaintiffs' proposed expert was not qualified. Thus, because plaintiffs failed to present expert testimony sufficient to support their claims, and because we have already held that the doctrine of res ipsa loquitur

50

does not relieve plaintiffs of this burden,[75] we affirm the part of the judgment of the Court of Appeals that held that plaintiffs' expert was not qualified and remand the case to the circuit court for reinstatement of the circuit court's order dismissing plaintiffs' claim with prejudice.

In *Hamilton*, the Court of Appeals improperly reversed the judgment of the circuit court and held that plaintiff's proposed expert was qualified under MCL 600.2169.  We therefore reverse the judgment of the Court of Appeals and remand the case to the circuit court for reinstatement of the circuit court's order granting a directed verdict to defendant Kuligowski.

Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.

---

[75] *Woodard I, supra,* 473 Mich  at 9-10.